**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GERMAN OCHOA; CLAUDIA DIAZ,
                        *Petitioners,*

v.

ALBERTO R. GONZALES, Attorney
General,
                        *Respondent.*

No. 03-72322

Agency Nos.
A77-421-768
A77-421-769

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 15, 2005—San Francisco, California

Filed May 16, 2005

Before: Donald P. Lay,* Betty B. Fletcher, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge B. Fletcher

---

*The Honorable Donald P. Lay, Senior United States Circuit Judge for
the Eighth Circuit, sitting by designation.

**COUNSEL**

Stephen Shaiken, Law Offices of Stephen Shaiken, San Francisco, California, for the petitioners.

Peter D. Keisler, Richard M. Evans, & John L. Davis, Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

B. FLETCHER, Senior Circuit Judge:

German Ochoa, the primary petitioner, and his wife Claudia Diaz, the secondary petitioner, are natives and citizens of Colombia. They petition for review of a Bureau of Immigration Appeals' ("BIA") order denying asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").

Removal proceedings against the petitioners commenced on or about January 14, 1999. Because the proceedings were initiated after April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), the permanent rules apply. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1102 (9th Cir. 2004). The parties conceded at oral argument that the petitioners are subject to final orders of removal. This court has jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252. *Moran v. Ashcroft*, 395 F.3d 1089, 1091 (9th Cir. 2005).

## Factual Background

In Colombia, Ochoa owned a women's clothing store in the San Andresito Shopping Center. Initially, Ochoa purchased clothes in Colombia and sold them at his shop. Then in 1996, he started traveling to the United States to purchase clothing. The clothes he purchased were shipped to Colombia, where he sold them wholesale and retail. In the course of Ochoa's business he borrowed $20,000 from a private lender. The money was lent to Ochoa at six percent interest monthly, seventy-two percent interest annually.

In addition to lending money, the lender sent retailers to Ochoa. The retailers would buy clothing from Ochoa on credit and then resell the clothes. The retailers would post-date

checks for the clothes and thirty days later Ochoa would cash the checks. Several of the retailers defaulted on their checks. Ochoa never recovered the money. Because the retailers defaulted on their credit, Ochoa could not repay his loan.

Soon thereafter a man named Efrain came to Ochoa's store on behalf of the lender to collect the money. In a very harsh way, Efrain demanded Ochoa repay the money immediately. Ochoa had heard that Efrain was the "kind of person that you had to watch out for, that he had possibly killed one or two people, but that no one could really prove it." Ochoa was also approached by a person who claimed to own the money lent to Ochoa. This person, who never said his name, proposed a plan for Ochoa to work for him to repay the loan. Ochoa testified, "he simply wanted me to keep on doing my traveling, so they'd be in charge of picking up my merchandise, send it to Colombia, and then delivering it to me." Ochoa's testimony and evidence in the record indicates the lender was a narco-trafficker and that he was pressuring Ochoa to participate in a narco-trafficking money laundering scheme.

Ochoa did not accept the proposal. Instead, Ochoa offered to give the lender/narco-trafficker his house, car, and business to pay off the loan. The approximate value of these things was $30,000. This would have been an immediate fifty percent profit on the loan. The lender refused. Ochoa's friends and family advised him to reject the deal and "to just get out, to leave." They said that people who "worked" for the lenders "normally got killed, or else those who refused to work for them got killed right away." Ochoa said in his asylum declaration that "In San Andrecito merchants disappeared on a regular basis without any police inquiry, when the merchants had [fallen] in disgrace[ ] with the money lenders."

Because of the threats to their lives Ochoa and Diaz left Colombia and came to the United States. Ochoa entered the United States on December 4, 1997. Diaz entered approximately a month and a half later. They have not returned to

Colombia since. Ochoa believes the situation in Colombia has "actually gotten worse" since they left.

## Procedural History

The IJ found the petitioners credible and directed Colombia as the country of removal. The IJ denied the petitioners' applications for asylum and withholding because he found the petitioners did not prove their fear of persecution was "on account of" an enumerated basis. The IJ found the petitioners would be subject to torture if they returned to Colombia and he granted them withholding under CAT.

The BIA affirmed the IJ's asylum and withholding decision because it found the persecution the petitioners fear is not on the basis of a protected ground. The BIA reversed the IJ's decision that granted relief under CAT. The BIA found there was not sufficient evidence to show the government's acquiescence in the feared torture. The BIA granted voluntary departure to Ochoa but denied voluntary departure to Diaz because she had not been in the United States for the required period of time.

## Standard of Review

The Ninth Circuit reviews the BIA's legal conclusions de novo. *Azanor v. Ashcroft*, 364 F.3d 1013, 1018 (9th Cir. 2004). Factual findings made by the BIA are reviewed under the deferential substantial evidence standard and will be upheld unless the evidence compels a contrary result. 8 U.S.C. § 1252(b)(4)(B); *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003).

When the BIA conducts a de novo review of an IJ's decision, rather than adopting the IJ's decision as its own, the Ninth Circuit reviews the BIA's decision. *Kankamalage v. INS*, 335 F.3d 858, 861 (9th Cir. 2003). Here the BIA issued its own opinion.

## Analysis

## A.   Asylum and Withholding of Removal

[1] Eligibility for asylum requires showing a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). The persecutor must be a government official or persons the government is unable or unwilling to control. *See Avetovo-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000). Withholding of removal requires showing a clear probability of the same. 8 U.S.C. § 1231(b)(3); *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001).

[2] The dispute in this case is not over whether the petitioners have a legitimate fear of persecution. It is clear that if Ochoa and Diaz return to Colombia they will likely be targeted and possibly killed by drug traffickers. Ochoa credibly testified that he fears for his life if he is returned to Colombia. The record is replete with evidence showing frequent use of violence by guerillas and narco-traffickers in Colombia[1] and that the Colombian government is unable to protect the petitioners.[2] Thus, the only question here is whether the persecution

---

[1]U.S. Dep't of State, *Columbia-Profile of Asylum Claims & Country Conditions*, June 1997; *Colombia in Crisis*, Journal of Commerce, Aug. 17, 1998 at 6A; *Colombian Murder Rate Rises 19 Per Cent*, Gazette, May 6, 1998 at B6; *Crime Rising in Already Crime-Ridden Colombia*, Agence France Press, May 4, 1998; County Profile, Quest Economics Database, Oct. 1997 at 54; *Gunmen Kill Parents, Nine Children in Colombia*, AAP Newsfeed, May 7, 1998; *Kidnappings Grow by 42 Percent*, Boston Globe, Apr. 27, 1999 at A21.

[2]The 1997 *Colombia-Profile of Asylum Claims & Country Conditions* by the State Department notes: "Rampant impunity is at the core of the country's human rights problems. According to Government reports, three-quarters of all crimes go unreported, and law breakers are never brought to justice in 97-99.5 percent of all crimes. The Samper administration has yet to take sufficient action to curb increasing abuses by paramilitary groups." *See also* IJ opinion ("The respondents have submitted a plethora of evidence to show that those that are in a position, public officials, to protect respondents are corrupt and have so thoroughly been infiltrated by drug traffickers that the narcotics traffickers have become almost a shadow government.").

feared by the petitioners would be on account of race, religion, nationality, membership in a particular social group, or political opinion. The petitioners argue their fear of persecution stems from membership in a particular social group and imputed political opinion.

*Membership in a particular social group*

[3] Ochoa argues he is a member of a social group comprised of business owners in Colombia who rejected demands by narco-traffickers to participate in illegal activity. The term "particular social group" is not defined by the Immigration and Naturalization Act. The BIA has said a social group requires "a common, immutable characteristic." *Matter of Acosta*, 19 I.&N. Dec. 221, 233 (BIA 1985). In contrast, this court has said a social group requires a "voluntary associational relationship." *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986). We harmonized these definitions by saying, "a 'particular social group' is one united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000).

[4] Key to establishing a "particular social group" is ensuring that the group is narrowly defined. This court has said:

> Major segments of the population of an embattled nation, even though undoubtedly at some risk from general political violence, will rarely, if ever, constitute a distinct "social group" for the purposes of establishing refugee status. To hold otherwise would be tantamount to extending refugee status to every alien displaced by general conditions of unrest or violence in his or her home country.

*Sanchez-Trujillo*, 801 F.2d at 1577. This was of particular concern to the IJ and the BIA in this case. Both feared the social group was "too broad." We agree.

**[5]** A social group of business persons in Ochoa's circumstances is too broad to qualify as a particularized social group. There is neither a voluntary relationship nor an innate characteristic to bond its members. Business persons targeted by drug traffickers are analogous to the young, working class men of military age that this court found were not a social group in *Sanchez-Trujillo*. There this court said "[i]ndividuals falling within the parameters of this sweeping demographic division naturally manifest a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings." 801 F.2d at 1577. The same is true of business owners who resist pressure from narco-traffickers to participate in illegal activity. There is no unifying relationship or characteristic to narrow this diverse and disconnected group. This category is too broad to qualify as a particularized social group for the purposes of asylum and withholding of removal.

*Political opinion*

**[6]** Persecution on account of a political opinion may be based on an imputed political belief. *Canas-Segovia v. INS*, 970 F.2d 599, 601-02 (9th Cir. 1992). To prove persecution based on an imputed political belief the petitioner "must show that his persecutors actually imputed a political opinion to him." *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997). This may be shown through the petitioner's "association with, or relationship to, people who are known to hold a particular political opinion." *Navas v. INS*, 217 F.3d 646, 659 (9th Cir. 2000). For example, if one's family is politically active the family's views may be imputed to the individual. *See Ramirez Rivas v. INS*, 899 F.2d 864, 865-66 (9th Cir. 1990). Alternatively, a person's political neutrality or refusal to act may imply a political opinion and establish an imputed political belief. For example, in *Desir v. Ilchert*, 840 F.2d 723, 725

(9th Cir. 1988) the petitioner was arrested, threatened, and assaulted for refusing to pay bribes in return for fishing privileges. This court looked to the context of the petitioner's refusal to pay the bribes, i.e. the absence of political participation, and found it constituted a political choice. *Id.* at 729. To further explain political neutrality as a basis for asylum this court has said:

> [W]e have found persecution to be on account of imputed political opinion where, regardless of the petitioner's motives, he expressly refused to affiliate himself with a particular political faction or to accede to its extortionate demands, and was then perceived by the group as opposing it because of that refusal.

*Navas*, 217 F.3d at 660 n.19. But this court cautioned:

> Applicants can no longer establish that their persecution was "on account of" political opinion by inference, unless the inference is one that is clearly to be drawn from facts in evidence. . . . Persecution by anti-government guerillas may no longer, from that fact alone, be presumed to be "on account of" political opinion. The petitioner must prove something more than violence plus disparity of views.

*Sangha*, 103 F.3d at 1487 (citations omitted). Here the petitioners' claim is based on a theory of political neutrality, i.e. rejecting the narco-traffickers extortionate demands was an act of political neutrality. Thus, the question here is whether it is *clear* from the facts in evidence that the narco-traffickers' targeting of Ochoa would be, at least in-part,[3] on the basis of an imputed political opinion.

---

[3]A persecutor may have more than one motive for inflicting harm. "[A]n applicant need only produce evidence from which it is reasonable to believe that the harm was motivated, *at least in part*, by a protected ground." *Deloso v. Ashcroft*, 378 F.3d 907, 910 (9th Cir. 2004) (citation and quotation marks omitted).

**[7]** In this case, the record provides no evidence that the narco-traffickers imputed political beliefs to Ochoa. The record does, however, establish a non-political motivation for the narco-traffickers to seek out Ochoa: he owes them a large sum of money. Even considering the context of Ochoa's decision, the facts in evidence do not draw a clear inference that the narco-traffickers would attack Ochoa on the basis of an implied political opinion. To hold otherwise would directly conflict with this court's admonition in *Sangha* that "[p]ersecution by anti-government guerillas may no longer, from that fact alone, be presumed to be 'on account of' political opinion." 103 F.3d at 1487.

**[8]** The petitioners failed to proved their feared persecution was "on account of" a protected ground. Accordingly, the BIA's denial of asylum and withholding of removal is affirmed.

## B.   CAT Claim

**[9]** Under CAT a person qualifies for relief if "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Regulations implementing CAT define torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for . . . any reason based on discrimination of any kind . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). The feared torture need not be on account of an enumerated basis.

In this case, the BIA reversed the IJ's grant of relief under CAT. The BIA found Ochoa could not show the Colombian government acquiesced to the feared torture. The BIA applied its interpretation of government acquiescence from *Matter of S-V-*, 22 I.&N. Dec. 1306 (BIA 2000). That standard requires a petitioner to "do more than show that the officials are aware

of the activity constituting torture but are powerless to stop it." *Id.* at 1312. *Matter of S-V-* requires government officials to be "willfully accepting" of the feared torturous activities. *Id*.

**[10]** This standard was overruled by us in *Zheng v. Ashcroft*, 332 F.3d 1186, 1194-96 (9th Cir. 2003). We held that "[t]he BIA's interpretation and application of acquiescence impermissibly requires more than awareness and instead requires that a government be willfully accepting of a third party's tortuous activities." *Id.* at 1196. In Ochoa's case, the BIA required too much. For relief under CAT a petitioner need only prove the government is aware of a third party's tortuous activity and does nothing to intervene to prevent it. *Id.* at 1194.

**[11]** The BIA did not consider the facts of petitioners' case under the proper standard. As this court instructed in *Zheng*, in light of *INS v. Ventura*, 537 U.S. 12 (2002), this case is remanded "to the BIA to give the BIA the first opportunity to apply the correct standard of 'acquiescence.' " 332 F.3d at 1197. *See also Reyes-Reyes v. Ashcroft*, 384 F.3d 782, 788 (9th Cir. 2004).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.