# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE NELSON SANTOS-LEMUS,
                    *Petitioner,*

            v.

MICHAEL B. MUKASEY, Attorney
General,
                    *Respondent.*

No. 07-70604

Agency No.
A98-298-858

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 10, 2008—San Francisco, California

Filed September 8, 2008

Before: J. Clifford Wallace and Susan P. Graber,
Circuit Judges, and Robert J. Timlin,* District Judge.

Opinion by Judge Wallace

---

*The Honorable Robert J. Timlin, United States District Judge for the Central District of California, sitting by designation.

12383

**COUNSEL**

Stephen Shaiken, Law Office of Stephen Shaiken, San Francisco, California, for the petitioner.

James E. Grimes, Senior Litigation Counsel, and Erica B. Miles, Office of Immigration Litigation, Washington, D.C., for the respondent.

**OPINION**

WALLACE, Circuit Judge:

Santos-Lemus petitions from the dismissal by the Board of Immigration Appeals (Board) of his appeal from an immigration judge's (IJ) denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). We deny the petition.

I.

Santos-Lemus, a native and citizen of El Salvador, entered the United States without inspection on July 18, 2004. Prior to coming to the United States, he lived with his mother in Cologne San Jose la Chalatenango, El Salvador. This town, like many in El Salvador, was plagued by gang violence instigated by the Mara Salvatrucha, or MS-13 (Mara). Santos-Lemus's family had a number of problems with the Mara, beginning in 2000. In July of that year, Santos-Lemus's brother, Jose Ubidio Santos, was aboard a bus when armed Mara held him up at gunpoint, beat him, and took a small amount of money. After the incident, the Mara searched for Jose Ubidio at his school and threatened him. The Mara continued searching for Jose Ubidio for "revenge" because they were unable to take his shoes and clothing when they robbed him. As a result of the Mara's threats, Jose Ubidio left El Salvador later that year.

When the Mara realized Jose Ubidio was gone, they threatened the rest of Santos-Lemus's family. On June 29, 2001, the Mara shot and killed Santos-Lemus's oldest brother, Jose Cecilio Santos. The police did not investigate the murder, but Santos-Lemus testified at the hearing before the IJ that Jose Cecilio had insulted the Mara by asking them why they had a problem with his family. Santos-Lemus also testified he knew that the Mara were the ones who had killed Jose Cecilio because the gang had sent many anonymous notes threatening the family. After Jose Cecilio's murder, the Mara began to harass Santos-Lemus's youngest brother, Luis Alonzo Santos. In August of 2001, the Mara beat Luis, robbed him, and demanded that he have more money for them that afternoon or he would be killed. The Mara came to Santos-Lemus's home looking for Luis; in January of 2002, Luis left El Salvador.

Once his brothers left El Salvador, Santos-Lemus began to receive threats from the Mara. He testified that in March of 2003, he was beaten by a group of two hundred Mara, two of whom insulted him and told him that "the same thing was going to happen . . . as had happened to [his] other brother." His elbow was wounded with a knife, and a gang member kicked him in the back. On May 15, 2004, Santos-Lemus received an anonymous threat stating that he would be killed like his brother. He fled the country.

Santos-Lemus testified that during this time, no one in his family filed a complaint with police because they feared that the Mara would retaliate, and because the family believed that the police were involved with the Mara and would do nothing to help the family. He also testified that every time he or his brothers encountered the Mara, they were "looking for money" and that they would bother anyone to get money or jewelry.

Santos-Lemus testified that Luis currently lives with him in California and that Jose Ubidio is in the United States also.

He has two sisters and another brother who live in El Salvador in a town two hours away from his home town. None have had problems with the Mara. Santos-Lemus's mother remains in Chalatenango. Santos-Lemus testified that three months prior to the hearing there were men who cut wires around his mother's house and broke pieces off her roof, but there was no evidence that these men were Mara.

Santos-Lemus testified that he feared he would be killed by the Mara if he returned to El Salvador. He stated that he had never insulted or spoken out against the gang, and had never belonged to any type of organization in El Salvador. He stated he did not believe he could safely move to another city in El Salvador because gang members are everywhere.

The day Santos-Lemus entered the United States, the Department of Homeland Security issued him a Notice to Appear that charged him with removability as an alien present in the United States without being admitted or paroled. At an initial hearing on October 27, 2004, Santos-Lemus admitted the factual allegations in the Notice to Appear and conceded his removability; he also indicated that he would apply for asylum, withholding of removal, and CAT protection. He did so, and after he presented testimony and evidence in support of his applications, the IJ found Santos-Lemus credible but issued an oral decision denying asylum, withholding of removal, and CAT protection, and ordering Santos-Lemus removed to El Salvador.

Santos-Lemus timely appealed to the Board, arguing that he established he was persecuted on account of his membership in two particular social groups, (1) his family and (2) "the class of young men in El Salvador who resist the violence and intimidation of gang rule." He also claimed persecution on account of his anti-gang political opinion. Finally, he argued that he established it was more likely than not he would be tortured upon returning to El Salvador. The Board affirmed the IJ's denial of Santos-Lemus's asylum, withhold-

ing of removal, CAT claims and issued its own opinion dismissing the appeal.

The Board concluded that Santos-Lemus had not established a well-founded fear of future persecution on account of membership in a particular social group. As for Santos-Lemus's claim that he was persecuted on account of his family membership, the Board reasoned that even if Santos-Lemus's family were to be considered a particular social group, Santos-Lemus "cannot establish a well founded fear based upon his membership in that group because his mother has remained unharmed in El Salvador since his departure." With regard to Santos-Lemus's claim that he was persecuted because he was a member of a social group as "a young man in El Salvador resisting gang violence unstoppable by the police," the Board found this social group not cognizable because it has no "social visibility" and is not therefore a "particular social group" for asylum purposes.

The Board also rejected Santos-Lemus's claim that his resistance to gangs or his "anti-gang opinions" constituted political opinion, reasoning that expression of a fear of harm resulting from general conditions of violence and civil unrest does not substantiate a well-founded fear of persecution on account of political opinion. The Board concluded that because Santos-Lemus had "not established persecution or a well-founded [fear] of persecution 'on account of a qualifying ground,' he . . . failed to establish his eligibility for asylum" and withholding of removal.

Finally, the Board agreed with the IJ that Santos-Lemus did not establish that he will more likely than not be tortured in El Salvador, observing that his mother, "who is similarly situated to" him, has remained unharmed in El Salvador. Santos-Lemus timely petitioned this court for review of the Board's decision.

II.

We review the Board's legal conclusions *de novo. See Azanor v. Ashcroft*, 364 F.3d 1013, 1018 (9th Cir. 2004). We give *Skidmore* deference to the Board's "interpretation of the governing statutes and regulations," recognizing that, " 'while not controlling upon the courts by reason of their authority, [these interpretations] do constitute a body of experience.' " *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011, 1014 (9th Cir. 2006) (alteration in original) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "Factual findings made by the [Board] are reviewed under the deferential substantial evidence standard and will be upheld unless the evidence compels a contrary result." *Ochoa v. Gonzales*, 406 F.3d 1166, 1169 (9th Cir. 2005); *see also* 8 U.S.C. § 1252(b)(4)(B). Where, as here, "the [Board] conducts a de novo review of an IJ's decision, rather than adopting the IJ's decision as its own, [we] review[ ] the [Board's] decision." *Ochoa*, 406 F.3d at 1169.

The government argues that we should review the decisions of both the Board and the IJ, and urges affirmance of the Board's decision based on each of the grounds given in the IJ's decision. However, contrary to the government's suggestion, the Board did not incorporate the IJ's decision as its own. For the most part, the Board did not even refer to the IJ's decision or state that it agreed with the IJ. The only place the Board incorporated the IJ's decision was in its CAT analysis, where the Board stated that "we agree with the Immigration Judge that the respondent did not establish that he will more likely than not be tortured in El Salvador" and cited the IJ's opinion. Accordingly, except to the extent the Board incorporated as its own the IJ's decision on Santos-Lemus's CAT claim, our review is confined to the decision of the Board. *See Gonzalez v. INS*, 82 F.3d 903, 907 (9th Cir. 1996); *Acewicz v. INS*, 984 F.2d 1056, 1059 (9th Cir. 1993). The sole issues for review before us with respect to Santos-Lemus's asylum and withholding of removal claims are whether

Santos-Lemus showed a well-founded fear of persecution based on his family membership, whether his status as "a young man in El Salvador resisting gang violence" makes him part of a particular social group, and whether his resistance to gangs is a "political opinion."

## III.

**[1]** Eligibility for asylum requires showing a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). The persecutor must be a government official or individuals the government is unable or unwilling to control. *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000). Withholding of removal requires a clear probability of the same. 8 U.S.C. § 1231(b)(3); *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). Although the IJ gave a number of reasons for concluding that Santos-Lemus failed to establish eligibility for asylum, the Board decided the case on much narrower grounds, which we now address.

## A.

**[2]** Santos-Lemus asserts eligibility for asylum and withholding of removal based on his membership in his family, all of whom, he testified, were targeted by the Mara. The Board assumed for the purpose of argument in this case that Santos-Lemus's family was a "particular social group," but rejected his claim because Santos-Lemus "cannot establish a well-founded fear based upon membership in that group because his mother has remained unharmed in El Salvador since his departure. Her continued safety undermines [Santos-Lemus's] claim." For the purpose of our decision, we make the same assumption. *But see Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam). Santos-Lemus challenges this decision, arguing that his mother has in fact continued to receive threats from the Mara, and alternatively that, even if his mother were safe,

her safety does not affect his well-founded fear because she and Santos-Lemus are not similarly situated.

**[3]** Substantial evidence supports the Board's factual finding that Santos-Lemus's mother has remained safely in El Salvador. At his hearing, Santos-Lemus was asked, "And does [your mother] have any problems with the Mara?" He responded, "No." Santos-Lemus went on to explain that some men had been around his mother's home during the night, and had cut some wires surrounding the home and broken pieces off of the roof, but there was no evidence that these men were affiliated with the Mara. Santos-Lemus's vague account of the damage to his mother's house does not compel reversal of the Board's finding that Santos-Lemus's mother "has remained unharmed in El Salvador since his departure."

**[4]** Moreover, Santos-Lemus's mother's continuing safety in El Salvador is substantial evidence supporting the Board's finding that Santos-Lemus does not have a well-founded fear of future persecution. We have considered the continuing safety of family members to be an important factor in determining whether a petitioner has a well-founded fear of future persecution. *See, e.g., Hakeem v. INS*, 273 F.3d 812, 817 (9th Cir. 2001) (affirming the Board's decision denying petitioner's application for withholding of removal and reasoning that his alleged fear of persecution on account of his religion was undermined by the fact that no one in his family had ever been charged, arrested, or harmed based on their religion).

**[5]** Where the claimed group membership is the family, a family member's continuing safety is an even more persuasive factor in considering a petitioner's well-founded fear. In *Aruta v. INS*, we affirmed the Board's denial of asylum for a petitioner who claimed a well-founded fear of future persecution based on her father's anti-terrorist activity. 80 F.3d 1389, 1396 (9th Cir. 1996). Our conclusion was based in part on the fact that the petitioner's sister, who was "identically situated in terms of the danger [petitioner] describe[d] in her applica-

tion and from which she [sought] asylum," remained safely in petitioner's city. *Id.* at 1393. We held there, as we have in other cases, that when similarly situated members of the petitioner's family live without incident in the alleged danger zone, "such family evidence and the inferences drawn from it . . . does substantially support the agency decision" denying asylum. *Id.* at 1395 (internal quotation marks omitted) (citing *Mendez-Efrain v. INS*, 813 F.2d 279, 282-83 (9th Cir. 1987)); *see also Estrada v. INS*, 775 F.2d 1018, 1021-22 (9th Cir. 1985) ("The absence of harassment of an alien's family tends to reduce the probability of persecution").

**[6]** Here, too, where Santos-Lemus's claim of persecution is based on his membership in the "particular social group" of his "family," the fact that a family member has remained unharmed since he left El Salvador is "substantial evidence" supporting the Board's finding that Santos-Lemus lacks a well-founded fear of future persecution based on family membership.

**[7]** Santos-Lemus recognizes that ongoing family safety might mitigate a well-founded fear of future persecution, but argues that in his case, unlike in *Aruta*, he is not similarly situated to his mother because "she is a female and the Maras gang targeted young males in El Salvador, not older females." However, while that argument might be relevant to his claim that he was persecuted based on his membership in the social group of young males in El Salvador who resist gang violence, it is not relevant with respect to his argument that he was persecuted based on membership in his family. Santos-Lemus has repeatedly asserted that "the Mara felt his entire family was responsible and began to harass them" and that "his entire family was targeted by the Maras." Indeed, his speculation that the Mara were behind the damage to his mother's house belies his assertion that she is not similarly situated to him. He has provided no coherent argument explaining why his mother was not similarly situated to him with respect to his proposed social group of his family, and

so her continued safety is substantial evidence supporting the Board's finding.

Nor does Santos-Lemus's reliance on *Lim v. INS*, 224 F.3d 929 (9th Cir. 2000), save his claim. In that case, the petitioner was a former police officer who had worked against a terrorist group from whom he personally received death threats and members of which had murdered his colleagues. *See id.* at 932. The petitioner in *Lim* did not assert that he was subject to persecution based on his family membership, and no evidence suggested he was similarly situated to his family with respect to the risks he faced as a result of his former job. Therefore, our conclusion that, "although relevant, the fact that [petitioner's] family is safe does not refute his claims of persecution," *id.* at 935 (internal quotation marks omitted), simply has no bearing on Santos-Lemus's claim. Substantial evidence therefore supports the Board's finding that Santos-Lemus's mother's continued safety in his hometown undermines his well-founded fear of persecution on the basis of his family membership, and we deny his petition based on this claim.

### B.

**[8]** Santos-Lemus also asserts eligibility for asylum and withholding of removal based on his membership in the group of "young [men] in El Salvador resisting gang violence." We have defined "social group" for purposes of asylum, as any group "united by 1) a voluntary association which imparts some common characteristic that is fundamental to the members' identities, or 2) an innate characteristic which is so fundamental to the identities or consciences of its members they either cannot or should not be required to change it." *Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007). In determining whether a social group exists, we consider certain factors, including "whether a group's shared characteristic gives members social visibility and whether the group can be defined with sufficient particularity to delimit its member-

ship." *Id.* at 944-45 (citing *In re A-M-E*, 24 I. & N. Dec. 69, 74-76 (B.I.A. 2007)).

Santos-Lemus argues that the Board erred when it held that his proposed group of "[young men] in El Salvador resisting gang violence" is not a "particular social group" for purposes of asylum because it has no "social visibility." Santos-Lemus contends that he "established that as a member of a class of young men in El Salvador who share the immutable characteristic of resistence to violence and intimidation of gang rule in an atmosphere of police indifference or inadequacy, he is a member of a particular social group, deserving of protection from future persecution."

**[9]** We have not considered whether "young [men] in El Salvador resisting gang violence" is a "particular social group" under applicable asylum and withholding of removal standards. However, the Board recently issued an opinion holding that a proposed group consisting of "young Salvadorans who have been subject to recruitment efforts by criminal gangs, but who have refused to join for personal, religious, or moral reasons, . . . does not qualify as a particular social group." *Matter of S-E-G-*, 24 I. & N. Dec. 579, 588 (B.I.A. 2008). There, the Board explained that "membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility." *Id.* at 582. The group of young Salvadorans who have been subject to recruitment efforts by criminal gangs, but who have refused to join, satisfied neither the "particularity" nor the "social visibility" standard. While the Board's decision in *Matter of S-E-G-* is not binding on us, we have already adopted the Board's particularity and social visibility requirements in determining whether a purported association or characteristic creates a particular social group. *See Arteaga*, 511 F.3d at 944-45. The Board's analysis in *Matter of S-E-G-* is therefore particularly helpful.

**[10]** The Board first held that the proposed social group did not meet the particularity requirement. It explained that "the

essence of the 'particularity' requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Matter of S-E-G-*, 24 I. & N. Dec. at 584. The Board then held that the social groups in that case lacked particularity because "[t]hey make up a potentially large and diffuse segment of society, and the motivation of gang members in recruiting and targeting young males could arise from motivations quite apart from any perception that the males in question were members of a class." *Id.* at 585.

This analysis is consistent with our case law on similar issues. In *Sanchez-Trujillo v. INS*, we held that a purported social group of "young, working class males who have not served in the military of El Salvador" was too "all-encompassing [a] grouping" to constitute "that type of cohesive, homogeneous group to which we believe the term 'particular social group' was intended to apply." 801 F.2d 1571, 1572, 1577 (9th Cir. 1986). "Individuals falling within the parameters of this sweeping demographic division naturally manifest a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings." *Id.* at 1577.

We later relied on that reasoning in *Ochoa* to reject the claim that "a social group comprised of business owners in Colombia who rejected demands by narco-traffickers to participate in illegal activity" was a particular social group because the group was not sufficiently narrowly defined. 406 F.3d at 1170. We reasoned that "[t]here is no unifying relationship or characteristic to narrow this diverse and disconnected group. This category is too broad to qualify as a particularized social group for the purposes of asylum and withholding of removal." *Id.* at 1171.

**[11]** Based on the Board's decision in *Matter of S-E-G-* and our relevant case law, we hold that the group that Santos-Lemus describes, young men in El Salvador resisting gang

violence, is too loosely defined to meet the requirement for particularity. In fact, Santos-Lemus's group is even less defined than the purported social group in *Matter of S-E-G-* because it is not limited to young men who have been recruited by gangs, but also includes any young men who for any reason resist gang violence and intimidation. This purported group is composed of a variety of different individuals who may be victims of civil unrest, but who do not form a cohesive or particular social group. As in *Sanchez-Trujillo* and *Ochoa*, Santos-Lemus's proposed group includes a sweeping demographic division; it is too broad and diverse to qualify as a particular social group.

[12] Moreover, Santos-Lemus's group fails to qualify as a particular social group because it lacks social visibility. The Board held in *Matter of S-E-G-* that the proposed social group of young men resisting criminal gang recruitment is insufficiently socially visible to constitute a particular social group. 24 I. & N. Dec. at 587. Social visibility requires that "the shared characteristic of the group should generally be recognizable by others in the community." *Id.* at 586. The Board reasoned that there is little evidence that "Salvadoran youth who are recruited by gangs but refuse to join . . . would be 'perceived as a group' by society, or that these individuals suffer from a higher incidence of crime than the rest of the population." *Id.* at 587. "[G]ang violence and crime in El Salvador appear to be widespread, and the risk of harm is not limited to young males who have resisted recruitment . . . but affects all segments of the population." *Id.*

[13] The same reasoning applies to Santos-Lemus's proposed social group. The harassment appears to have been part of general criminality and civil unrest; Santos-Lemus even testified that the Mara gang robbed "anyone" and "everyone" to get money and jewelry. Santos-Lemus's "group" was not particularly socially visible to the gang, and there is no evidence that they targeted him because they perceived him to be a member of any kind of anti-gang group.

**[14]** Indeed, the only people who appear to know about Santos-Lemus's anti-gang stance are his own family and some members of the Mara gang. Nothing in the record establishes that he was a well-known anti-gang activist or even outspoken about gangs. On the contrary, he testified that he never spoke out against or insulted gang members. Thus, there does not appear to be anything about Santos-Lemus's actions that would distinguish him from the rest of the population or cause others who oppose gang violence to recognize him as a member of their "group."

**[15]** Lacking both particularity and social visibility, Santos-Lemus's proposed group is not a "particular social group" for asylum purposes. We therefore affirm the Board's conclusion and deny Santos-Lemus's petition with respect to his claim that he qualifies for asylum based on membership in a social group of young Salvadoran men who resist gang violence and intimidation.

## C.

**[16]** Santos-Lemus also asserts he is entitled to refugee protection because he was persecuted based on his anti-gang "political opinion." He argued to the Board that he was "anti-gang" and that he manifested this opinion in expressing resistance against the Mara, as a result of which he was persecuted. The Board rejected this argument, holding that "resistance to gangs or 'anti-gang opinions' " is not a "protected political opinion."

It is well-established in this circuit that

> [a]sylum generally is not available to victims of civil strife, unless they are singled out on account of a protected ground. To put it another way, "persecution on account of political opinion . . . can[not] be inferred merely from acts of random violence by members of a village or political subdivision against

their neighbors who may or may not have divergent
. . . political views."

*Ochave v. INS*, 254 F.3d 859, 865 (9th Cir. 2001) (alteration
and ellipses in original) (quoting *Sangha v. INS*, 103 F.3d
1482, 1487 (9th Cir. 1997)). In *Matter of S-E-G-*, the Board
held that because there was "no evidence in the record that the
respondents were politically active or made any anti-gang
political statements," their resistance to gang recruitment was
not necessarily based on a "political motive" and they could
not show a well-founded fear of future persecution on account
of their political opinion. 24 I. & N. Dec. at 589.

**[17]** Similarly here, Santos-Lemus provided no evidence
that his opposition to the gang's criminal activity was based
on political opinion. Santos-Lemus also did not present evi-
dence that he was politically or ideologically opposed to the
ideals espoused by the Mara or to gangs in general, or that the
Mara imputed to Santos-Lemus any particular political belief.
The available evidence suggests instead that Santos-Lemus
was victimized for economic and personal reasons. These
motivations do not constitute persecution on account of politi-
cal opinion.

**[18]** Santos-Lemus suggests, for the first time on appeal,
that he suffered past persecution on account of an imputed
political opinion stemming from his and his brothers' refusals
to join the gang. The Board in *Matter of S-E-G-*, relying on
the Supreme Court's decision in *INS v. Elias-Zacarias*, 502
U.S. 478 (1992), rejected the argument that resistance to a
gang's recruitment efforts alone constitutes political opinion.
24 I. & N. Dec. at 588. In any event, Santos-Lemus never
raised this claim to the Board and it is therefore not
exhausted. *See* 8 U.S.C. § 1252(d)(1); *Barron v. Ashcroft*, 358
F.3d 674, 677-78 (9th Cir. 2004). Furthermore, this claim is
wholly unsupported by the record. Santos-Lemus neither
stated in his application for asylum, nor in his testimony at his
hearing, that he or his brothers refused to join the gang. He

only stated that the gang members were easily insulted and that one of his brothers insulted them by asking them why they were after his family, and that Santos-Lemus stood silently when the Mara insulted and attacked him.

**[19]** No evidence suggests that the gang held any sort of belief system that they perceived Santos-Lemus to oppose. Without evidence of an actual political opinion or motive in Santos-Lemus's or the gang's actions, his claim fails. The Board's determination that a general aversion to gangs does not constitute a political opinion for asylum purposes was reasonable and we deny Santos-Lemus's petition based on this claim.

## IV.

**[20]** Santos-Lemus also challenges the Board's denial of his request for relief under CAT. To obtain protection under CAT, an applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). The torture must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official." *Id.* § 1208.18(a)(1). Torture is "an extreme form of cruel and inhuman treatment," and includes only "severe pain or suffering." *Id.* § 1208.18(a)(1), (2). The Board agreed with the IJ's decision, and concluded that Santos-Lemus did not establish that he will more likely than not be tortured in El Salvador, observing again that his mother had remained unharmed in El Salvador since his departure. Santos-Lemus counters that it is more likely than not he will be subject to torture upon returning to El Salvador because "the police were unwilling or unable to protect him from gang violence and that very likely, the police themselves either cooperated with the Maras gang or were themselves members of this gang."

**[21]** Santos-Lemus provides no evidence that would compel reversal of the Board's determination. His argument that

police are unwilling to protect him or are themselves members of the gang is unsupported and speculative, particularly because he failed to report any incidents to the police. Moreover, it is undisputed that any torture Santos-Lemus fears would be committed by private individuals, not the government, and the Salvadoran government was not even aware that Santos-Lemus or his brothers had been targeted by the gang because the incidents were never reported and there is no evidence in the record suggesting the government may have otherwise been aware of threats made against Santos-Lemus. Finally, as the Board stated, because Santos-Lemus's mother has remained safely in his hometown, substantial evidence supports the Board's finding that it is not more likely than not that Santos-Lemus will be tortured by or with the consent or acquiescence of the Salvadoran government upon return. We therefore deny his petition for review based on the CAT claim.

V.

Substantial evidence supports the Board's finding that Santos-Lemus's fear of persecution based on family membership was not well-founded and that it is not more likely than not that he will be tortured if returned to El Salvador. Additionally, the Board correctly determined that Santos-Lemus's proposed group of "young [men] in El Salvador resisting gang violence" is not a "particular social group," and that a general anti-gang opinion is not a protected political opinion, for asylum and withholding of removal purposes. We therefore deny his petition for review.

**PETITION DENIED.**