**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATTIA GUADALUPE ESCOBAR,
                    *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

Nos. 07-72843
        08-71777

Agency No.
A075-504-052

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 8, 2008—Pasadena, California

Filed May 27, 2009

Before: Jerome Farris, Susan P. Graber,* and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Graber

_____

*Judge Susan P. Graber was drawn to replace Judge William W Schwarzer pursuant to General Order 3.2(g). Judge Graber has read the briefs, reviewed the record, and listened to the recording of oral argument held on December 8, 2008.

6187

**COUNSEL**

Christopher J. Stender, Stender & Lappin, PC, San Diego, California, for the petitioner.

Carol Federighi, Office of Immigration Litigation, U.S. Department of Justice, Civil Division, Washington, D.C., for the respondent.

**OPINION**

WARDLAW, Circuit Judge:

We must decide whether our decision in *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013 (9th Cir. 2005), compels the conclusion that a parent's status as an alien lawfully admitted for permanent residence may be imputed to an unemancipated minor child residing with that parent, for purposes of satisfying the five-year permanent residence requirement for cancellation of removal under section 240A(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229b(a)(1). Because the rationale and holding of *Cuevas-Gaspar* apply equally to the five-year permanent residence and the seven-year continuous residence requirements, we conclude that it does.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

Kattia Guadalupe Escobar ("Escobar") is a native and citizen of El Salvador. She came to the United States and settled in California with her mother in the early 1980s, when she

was approximately five years old. Her mother adjusted her status to lawful permanent residence on March 3, 1992, when Escobar was thirteen. Escobar herself attained lawful permanent resident status on February 15, 2003. She has two U.S. citizen children.

On August 12, 2006, after Escobar attempted to drive an undocumented Mexican child across the border from Tijuana,[1] the Department of Homeland Security ("DHS") issued a Notice to Appear charging Escobar with removability under section 212(a)(6)(E)(i) of the INA, 8 U.S.C. § 1182(a)(6)(E)(i) ("Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible.").

In removal proceedings, the immigration judge ("IJ") found Escobar removable under section 212(a)(6)(E)(i) and held that she was ineligible for cancellation of removal as a lawful permanent resident. Title 8 U.S.C. § 1229b(a) provides for cancellation of removal for a permanent resident who "(1) has been an alien lawfully admitted for permanent residence for not less than 5 years, (2) has resided in the United States continuously for 7 years after having been admitted in any status, and (3) has not been convicted of any aggravated felony." Under *Cuevas-Gaspar*, the seven-year continuous residence requirement in subsection (a)(2) was satisfied for Escobar by imputing the 1992 admission of her mother for permanent residence. *See* 430 F.3d at 1023-24. However, the IJ determined that Escobar's mother's status could not be imputed to satisfy

---

[1]While Escobar was in Tijuana, she agreed to take the child across the border to see his mother, who was near death in a hospital in the United States. In a sworn statement given to Border Patrol officers shortly after they discovered the child's identity, Escobar admitted that she had known the boy lacked the appropriate documents when she attempted to drive him across the border. Aside from the Notice to Appear, no other convictions, charges, or government action resulted from this incident.

the five-year permanent residence requirement in subsection (a)(1).

Escobar appealed to the Board of Immigration Appeals ("BIA"), raising only the issue of her eligibility for cancellation of removal. In a published decision, the BIA noted its disagreement with *Cuevas-Gaspar*, declined to apply *Cuevas-Gaspar*'s holding to allow imputation for the five-year permanent residence requirement, and dismissed Escobar's appeal. *In re Escobar*, 24 I. & N. Dec. 231 (BIA 2007). Escobar filed a timely petition for review on July 19, 2007.

More than five months later, Escobar submitted a motion to reopen to the BIA, raising the new argument that it was legally impossible to have "encouraged, induced, assisted, abetted, or aided" a minor, age eight, "to enter or to try to enter the United States" illegally, because a child of that age lacked the capacity to intend "to enter." 8 U.S.C. § 1182(a)(6)(E)(i). The BIA denied her motion in a one-judge per curiam decision on April 4, 2008, as untimely. The BIA also stated that, even if it were "to reopen proceedings *sua sponte*, the respondent has failed to establish a likelihood of success on the merits of her claim." Escobar timely appealed the denial of her motion to reopen, and we consolidated the petitions for review. *See* 8 U.S.C. § 1252(b)(6).

## II.  JURISDICTION AND STANDARD OF REVIEW

Under 8 U.S.C. § 1252(a)(2)(D), we have jurisdiction to review constitutional claims and questions of law involved in the otherwise discretionary decision to deny cancellation of removal. *See Mota v. Mukasey*, 543 F.3d 1165, 1167 (9th Cir. 2008). Although we review de novo questions of law, we defer to the BIA's interpretation of immigration laws unless the interpretation is "clearly contrary to the plain and sensible meaning of the statute." *Id.* (internal quotation marks omitted). We review the BIA's denial of a motion to reopen for an abuse of discretion. *Cardoso-Tlaseca v. Gonzales*, 460

F.3d 1102, 1106 (9th Cir. 2006). "An abuse of discretion will be found when the denial was arbitrary, irrational or contrary to law." *Oh v. Gonzales*, 406 F.3d 611, 612 (9th Cir. 2005) (internal quotation marks omitted).

## III. DISCUSSION

### A. Escobar's Eligibility for Cancellation of Removal

#### 1. *Imputation of Status, Intent, and State of Mind to Unemancipated Minor Children*

**[1]** "[B]oth the BIA and this court repeatedly have held that a parent's status, intent, or state of mind is imputed to the parent's unemancipated minor child in many areas of immigration law, including asylum, grounds of inadmissibility, and legal residency status." *Cuevas-Gaspar*, 430 F.3d at 1024; *see also, e.g.*, *Vang v. INS*, 146 F.3d 1114, 1116-17 (9th Cir. 1998) (imputing a parent's "firm resettlement" under 8 C.F.R. § 1208.15 to a sixteen-year-old minor); *Senica v. INS*, 16 F.3d 1013, 1015-16 (9th Cir. 1994) (imputing a parent's knowledge of ineligibility for admission to that parent's minor children to deny their application for discretionary admission under 8 U.S.C. § 1182(k)); *Matter of Huang*, 19 I. & N. Dec. 749, 750 n.1 (BIA 1988) ("Abandonment of lawful permanent resident status of a parent is imputed to a minor child who is subject to the parent's custody and control." (citing *Matter of Winkens*, 15 I. & N. Dec. 451 (BIA 1975)). As we explain in a companion case, also filed today, "[w]e have allowed imputation precisely because the minor either was legally incapable of satisfying one of these criteria or could not reasonably be expected to satisfy it independent of his parents." *Ramos Barrios v. Holder*, No. 06-74983, at 6292-93 (9th Cir. 2009).[2]

---

[2]In *Ramos Barrios*, we declined to impute a parent's "physical presence" for purposes of satisfying the requirement set forth in 8 C.F.R. § 1240.66(b)(2). *See Ramos Barrios*, No. 06-74983, at 6285-98. In declining to impute physical presence, we stressed that "the definition of 'physi-

On several occasions, we have confronted situations in which a parent would qualify for relief under section 240A(a) or its predecessor, section 212(c),[3] while a child who at all times had been in the physical custody of that parent would not. In recognition of the fundamental concerns motivating this form of discretionary relief, we have consistently imputed a parent's satisfaction of the provision's status requirements to the unemancipated minor children in that parent's custody.

### a.  *Section 212(c) and Lepe-Guitron*

In *Lepe-Guitron*, we considered whether, "under section 212(c), a parent's lawful unrelinquished domicile is imputed to his or her minor children." 16 F.3d at 1022. Concluding that imputation was appropriate, we first distinguished our holding in *Castillo-Felix* that " 'to be eligible for [section 212(c)] relief, aliens must accumulate seven years of lawful unrelinquished domicile *after their admission for permanent residence.*' " *Id.* at 1024 (quoting *Castillo-Felix v. INS*, 601 F.2d 459, 467 (9th Cir. 1979)). In light of "crucial differences" between the applicant in *Castillo-Felix*, who had entered the United States illegally and acquired permanent resident status only after marrying, and Lepe-Guitron, who had entered legally with his parents and was "always legally within the country," but nevertheless "acquired permanent

cal presence' does not require a specific status, intent, or state of mind," *id.* at 6294 (internal quotation marks omitted), unlike the terms at issue in *Lepe-Guitron v. INS*, 16 F.3d 1021 (9th Cir. 1994), *Cuevas-Gaspar*, and our other imputation precedent, *see Ramos Barrios*, No. 06-74983, at 6291-94.

[3]INA section 240A(a), 8 U.S.C. § 1229b(a), governs cancellation of removal for permanent residents. The provision was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), to replace and modify a similar form of relief previously available under INA section 212(c), 8 U.S.C. § 1182(c) (repealed 1996). *See* IIRIRA § 304(b), 110 Stat. 3009-597; *INS v. St. Cyr*, 533 U.S. 289, 297 (2001).

resident status . . . many years after his parents achieved it," we concluded that *Castillo-Felix* did not foreclose the possibility of imputation. On the contrary, we found a "number of persuasive reasons to hold that a child's 'lawful unrelinquished domicile' under section 212(c) is that of his or her parents." *Id.*

First, we observed that the "position espoused by the government would subvert the fundamental policies animating section 212(c)." *Id.* Severing the "bonds between parents and their children who had resided legally in the United States for the better part of their lives" would frustrate the section's "just and humane goal of providing relief to those for whom deportation would result in peculiar or unusual hardship." *Id.* at 1024-25 (citations and internal quotation marks omitted). Thus, "section 212(c)'s core policy concerns would be directly frustrated by the government's proposal to ignore the parent's domicile in determining that of the child." *Id.* at 1025. The existence of other "sections of the INA giving a high priority to the relationship between permanent resident parents and their children" lent strength to this analysis.[4] *Id.*

---

[4]We explained the high priority given to alien children in the context of visa preferences and waiver:

> Sections 1152 and 1153, which allocate the annual quota of immigrant visas, provide a preference for the alien children of United States residents and citizens. 8 U.S.C. §§ 1152(a)(4), 1153(a)(1) & (2). In considering applications for permanent resident status, a child residing outside the United States is given the same priority date and preference category as that of his or her parents. [8 C.F.R. § 1245.1(e)(vi)(B)(1)]. The Act even provides a waiver of excludability for certain immigrants who have helped their alien children enter the United States illegally. 8 U.S.C. § 1182(a)(6)(E)(ii) (family reunification waiver).

*Lepe-Guitron*, 16 F.3d at 1025; *see also Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005) ("The [INA] was intended to keep families together. It should be construed in favor of family units and the acceptance of responsibility by family members."); H.R. Rep. No. 85-1199, pt. 2 (1957), *reprinted in* 1957 U.S.C.C.A.N. 2016, 2020 (stating that the "legislative history of the [INA] clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united").

**[2]** Second, Congress's use of the term "domicile" reinforced the imputation of this form of status, because children are, "legally speaking, incapable of forming the necessary intent to remain indefinitely in a particular place," *id.*, and thus cannot determine their own domicile, *id.* at 1025-26. We therefore held that "parents' 'lawful unrelinquished domicile' should be imputed to their minor children under section 212(c)." *Id.* at 1026 (quoting 8 U.S.C. § 1182(c)). The Second and Third Circuits, the only other circuits to consider this issue before IIRIRA repealed section 212(c), reached the same conclusion, imputing a parent's accumulation of lawful unrelinquished domicile to that parent's minor children. *See Rosario v. INS*, 962 F.2d 220, 222-25 (2d Cir. 1992); *Morel v. INS*, 90 F.3d 833, 840-42 (3d Cir. 1996), *vacated on other grounds*, 144 F.3d 248 (3d Cir. 1998).

b. *Section 240A(a) and Cuevas-Gaspar*

We first considered the possibility of imputation under section 240A(a) in *Cuevas-Gaspar*. *See* 430 F.3d at 1021-29. Facing removal due to a 2002 conviction for a crime involving moral turpitude, Cuevas-Gaspar satisfied section 240A(a)(1)'s five-year permanent residence requirement. However, the IJ found him ineligible for cancellation of removal because he had not satisfied section 240A(a)(2)'s seven-year continuous residence requirement, although he had lived in the United States since 1985, when he was one year old. *Id.* at 1016-17; 8 U.S.C. § 1229b(a)(1), (2). The BIA affirmed in a reasoned opinion, rejecting Cuevas-Gaspar's argument that *Lepe-Guitron* allowed the imputation of his mother's continuous residence as a permanent resident to satisfy the seven-year requirement. *Cuevas-Gaspar*, 430 F.3d at 1017, 1021.

**[3]** Because the BIA interpreted section 240A(a) in its opinion, we applied *Chevron* deference in our review, asking "(1) whether 'the statute is silent or ambiguous with respect to the specific issue,' and if so (2) whether the agency's inter-

pretation is based on a reasonable, permissible construction of the statute." *Cuevas-Gaspar*, 430 F.3d at 1021 (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). After concluding that section 240A(a) is silent regarding imputation, *id.* at 1022, we took up the "tools of statutory construction" to assess "whether the BIA's interpretation of § 1229b(a) as being unamenable to imputation is a reasonable one," *id.* at 1024. Examining *Lepe-Guitron*, the legislative history of section 240A(a), and the statutory framework of the INA, we concluded that the BIA's interpretation was unreasonable, *see id.* at 1024-29, and held that "for purposes of satisfying the seven-years of continuous residence 'after having been admitted in any status' required for cancellation of removal under 8 U.S.C. § 1229b(a), a parent's admission for permanent resident status is imputed to the parent's unemancipated minor children residing with the parent," *id.* at 1029.

2.   *The Statutory Framework and Congressional Intent*

Before its repeal, section 212(c) provided that "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General." 8 U.S.C. § 1182(c) (repealed 1996).[5]

In applying section 212(c), the courts of appeals developed conflicting interpretations of its requirement that permanent residents demonstrate "a lawful unrelinquished domicile of seven consecutive years." *Id.* Our circuit and the Fourth Circuit followed the BIA's longstanding interpretation, restrict-

---

[5]Although section 212(c) "applies by its terms only to exclusion proceedings under subsection (a) of § 1182, judicial decisions . . . extended its reach to deportation proceedings." *Lepe-Guitron*, 16 F.3d at 1023; *see also St. Cyr*, 533 U.S. at 294-97.

ing the accumulation of "lawful unrelinquished domicile" to immigrants who had been admitted for permanent residence. *See Castillo-Felix*, 601 F.2d at 467; *Chiravacharadhikul v. INS*, 645 F.2d 248, 249-51 (4th Cir. 1981); *Matter of S.*, 5 I. & N. Dec. 116, 117-18 (BIA 1953). The Second, Third, and Seventh Circuits disagreed, concluding that the domicile requirement could be satisfied by lawful domicile prior to admission as a lawful permanent resident, so long as the immigrant was also eventually admitted for permanent residence. *See Lok v. INS*, 548 F.2d 37, 39-41 (2d Cir. 1977); *Morel*, 90 F.3d at 837-40; *Castellon-Contreras v. INS*, 45 F.3d 149, 150 (7th Cir. 1995). The Fifth, Tenth, Eleventh, and D.C. Circuits discussed the conflicting interpretations, but did not decide the issue. *See Madrid-Tavarez v. INS*, 999 F.2d 111, 112-13 (5th Cir. 1993); *Onwuneme v. INS*, 67 F.3d 273, 274 n.1 (10th Cir. 1995); *Melian v. INS*, 987 F.2d 1521, 1523-25 (11th Cir. 1993); *Anwo v. INS*, 607 F.2d 435, 436-38 (D.C. Cir. 1979).

The legislative history confirms that by enacting IIRIRA, Congress intended to address, among other things, the circuits' varying interpretations of section 212(c). In 1995, the Senate had considered a predecessor bill to IIRIRA entitled the Immigration Enforcement Improvements Act, S. 754, 104th Cong. (1995). *See* 141 Cong. Rec. S6082-04, S6092 (May 3, 1995). In Title III, section 309(b)(1), the bill set forth a cancellation of removal provision with the same basic requirements as section 240A(a): five years of permanent residence, and seven years of continuous residence.[6] In a section-

---

[6]Section 309(b) provided, in relevant part:

The Attorney General may cancel deportation in the case of an alien who is deportable from the United States and:

(1) is and has been a lawful permanent resident for at least 5 years who has resided in the United States continuously for 7 years after being lawfully admitted and has not been convicted of an aggravated felony or felonies for which the alien has been sentenced, in the aggregate, to a term of imprisonment of at least 5 years.

141 Cong. Rec. at S6098. The similarity between this provision and section 240A(a) is readily apparent.

by-section analysis of the bill, the U.S. Department of Justice stated that section 309(b) "would clarify an area of the law regarding the cutoff periods for these benefits that have given rise to significant litigation and different rules being applied in different judicial circuits." 141 Cong. Rec. at S6104.

**[4]** Section 240A(a) resolved the section 212(c) circuit split with the same compromise that had been proposed in the Immigration Enforcement Improvements Act, requiring at least five years of residence after being "lawfully admitted for permanent residence" and seven years of continuous residence "after having been admitted in any status." 8 U.S.C. § 1229b(a)(1), (2). It is thus apparent that, in enacting section 240A(a), Congress "intended to clear up a longstanding disagreement between the various courts of appeals and the BIA regarding the type of status necessary to qualify for relief under former § 212(c)." *Cuevas-Gaspar*, 430 F.3d at 1027; *see also Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1016 (9th Cir. 2006) ("Ultimately, Congress designed the dual requirement of a five-year legal permanent residency *and* seven-year continuous residence in any status, § 1229b(a)(1)(2), to clear up prior confusion and to strike a balance between the conflicting interpretations . . . by counting a limited period of time spent in non-permanent status while still requiring at least five years of permanent resident status." (internal quotation marks omitted)).[7]

**[5]** Moreover, it is equally apparent that Congress's modifications to section 212(c) were not intended to alter the availability of imputation to the unemancipated minor children of parents who qualified for relief. The circuits did not split as

---

[7]In enacting section 240A, Congress also intended to make cancellation of removal unavailable to lawful permanent residents who had been convicted of aggravated felonies. *See* 8 U.S.C. § 1229b(a)(3); *Cuevas-Gaspar*, 430 F.3d at 1027 (citing *St. Cyr*, 533 U.S. at 297). However, this change sheds no further light on Congress's intent regarding the other requirements of section 240A(a).

to the underlying policy objectives motivating section 212(c), but simply over the type of status necessary to satisfy "lawful unrelinquished domicile." Therefore, the fundamental goal underlying this discretionary remedy—"to provide relief from deportation for those who have lawfully formed strong ties to the United States," *Lepe-Guitron*, 16 F.3d at 1025—was unaffected by this clarification of the requirements to secure that relief.

### 3. *The BIA's Decision in* In re Escobar

In denying Escobar's direct appeal, the BIA disagreed with our opinion in *Cuevas-Gaspar* and declined to apply our reasoning to the five-year residence requirement in section 240A(a)(1). *See In re Escobar*, 24 I. & N. Dec. at 233-35. However, the holding, reasoning, and logic of *Cuevas-Gaspar* apply equally to the resident status requirements of both section 240A(a)(1) and 240A(a)(2), and thus imputation of the custodial parent's status to the minor is compelled.

#### a. *Our Deference to the BIA*

It is "well-established that Congress delegated to the BIA the authority to promulgate rules, on behalf of the Attorney General, that carry the force of law 'through a process of case-by-case adjudication.' " *Garcia-Quintero*, 455 F.3d at 1012 (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)). However, "only 'selected decisions of the Board rendered by a three-member panel or by the Board en banc may be designated to serve as precedents.' " *Id.* at 1013 (quoting 8 C.F.R. § 1003.1(g)). Although the BIA's published, three-member decision in *In re Escobar* requires *Chevron* deference, we have previously applied *Chevron* and found the BIA's interpretation of section 240A(a) unreasonable. *See Cuevas-Gaspar*, 430 F.3d at 1021-29. Indeed, when scrutinized, the BIA's decision in *In re Escobar* cannot fairly be characterized as a "new" interpretation of section 240A(a), but is rather the same unreasonable interpretation we rejected

in *Cuevas-Gaspar*.[8] Thus, our precedent guides our assessment of the BIA's interpretation under *Chevron*.

    b. *The Requirement of "Lawful" Admission for Permanent Residence and the Question of Congressional Intent*

**[6]** Contrary to the government's assertion, *Cuevas-Gaspar* is controlling precedent for the imputation of "lawful permanent resident *status* from a parent to a child." *In re Escobar*, 24 I. & N. Dec. at 234. Further, although being "lawfully admitted for permanent residence" is a term of art, defined in 8 U.S.C. § 1101(a)(20) as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed," it does not follow that allowing imputation for the five-year permanent residence requirement would "run contrary to the clear intent of Congress." *In re Escobar*, 24 I. & N. Dec. at 234.

**[7]** First, review of the plain language of the statute demonstrates that both sections 212(c) and 240A(a)(1) use a variant of the word "lawful" in setting out their requirements. Section 212(c) required "lawful unrelinquished domicile," and section 240A(a)(1) requires an applicant to have been "lawfully admitted for permanent residence." Thus, the government's emphasis on section 240A(a)(1)'s requirement of being "*lawfully* admitted" is clearly misplaced. 24 I. & N. Dec. at 234. If the change from requiring seven years of "domicile" to seven years of residence "after having been admitted" did not prevent imputation, *see Cuevas-Gaspar*, 430 F.3d at 1025-26, surely the change from "*lawful* unrelinquished domicile" to

---

[8]Indeed, the BIA's reliance on the same arguments in *In re Escobar* to reject both Escobar's appeal and *Cuevas-Gaspar* confirms that the rationale for imputation under section 240A(a)(2) applies with equal force to section 240A(a)(1), and that the BIA's interpretive positions are indistinguishable.

"*lawfully* admitted for permanent residence" should have no such effect. Indeed, when we decided *Lepe-Guitron*, we had already held that " 'to be eligible for [section 212(c)] relief, aliens must accumulate seven years of lawful unrelinquished domicile *after their admission for permanent residence.*' " 16 F.3d at 1024 (quoting *Castillo-Felix*, 601 F.2d at 467). Thus, by allowing imputation for minor children to satisfy the domicile requirement, *Lepe-Guitron* "necessarily held that a parent's admission to permanent resident status is imputed to the child" for purposes of section 212(c) relief. *Cuevas-Gaspar*, 430 F.3d at 1026. Accordingly, although the status requirement in section 240A(a)(1) is distinct, the distinction is not relevant, and we again conclude that the change in terminology is "not . . . so great as to be dispositive." *Id.* at 1026.

[8] Second, because Escobar actually has been admitted for permanent residence, it is beyond dispute that she has satisfied the substantive and procedural requirements of admission for permanent residence.[9] She has failed to satisfy only the five-year component of this requirement, which was imposed to probe the duration of an alien's lawful ties to the United States. *See Cuevas-Gaspar*, 430 F.3d at 1028-29. The government's defense of the BIA's decision is thus flawed in two critical respects: The decision is factually inaccurate in implying that Escobar has not satisfied the "mandated statutory and regulatory application process and the substantive eligibility requirements for admission." *In re Escobar*, 24 I. & N. Dec. at 234. The decision also erroneously suggests that imputing status for the sole purpose of assessing eligibility for cancellation of removal necessarily requires imputing in other contexts and with regard to other forms of relief. *See id.* at 234 n.4. Although the BIA asserts that "if imputation of a parent's lawful permanent residence would allow a minor alien to fulfill the requirements for cancellation of removal, the child

---

[9]We therefore do not consider the imputation of lawful permanent resident status to an unemancipated minor who has never been admitted for permanent residence.

would never have to become a lawful permanent resident in his own right," *id.* at 235, this is simply not the case. The possibility of cancellation only arises when removal proceedings have been initiated. Many more benefits accrue to those who attain lawful permanent resident status than the one avenue to relief from removal, such as eligibility for employment, the right to live permanently in the United States, the ability to vote in state and local elections that do not require U.S. citizenship, the ability to travel freely within and without the United States, and the ability to pursue U.S. citizenship. Imputing a parent's status for purposes of cancellation would convey none of these other significant and desirable benefits.

**[9]** Finally, the government wrongly asserts that allowing imputation under section 240A(a)(1) would be "inconsistent with the purpose of the [INA] and the intent of Congress when it amended the statute to add the relief of cancellation of removal for certain permanent residents." *Id.* at 233. If section 240A(a)'s silence regarding imputation suggests anything, it suggests that Congress acquiesced in the unanimous practice of the circuits to consider the issue, all of which had found imputation appropriate under section 212(c). Regardless, in light of the statutory scheme and legislative history of section 240A(a), allowing imputation for both the five- and seven-year requirements would not "essentially destroy the distinct tests mandated by Congress when it amended the statute," *id.* at 234, because the distinct tests were created to resolve a circuit split that did not concern imputation, *see Cuevas-Gaspar*, 430 F.3d at 1027. As discussed, section 240A(a) was only intended to clarify "the *type of status* necessary to qualify for relief." *Id.* (emphasis added). Therefore, unlike the "physical presence" at issue in *Ramos Barrios*, which does not include "an element of status, intent, or state of mind," *Ramos Barrios*, No. 06-74983, at 6292, the status requirements of section 212(c) and section 240A(a) are equally amenable to imputation.

**[10]** Moreover, even with imputation, the requirements of section 240A(a)(1) and (2) remain distinct, as all applicants for cancellation of removal as permanent residents are still required to demonstrate both five years spent as a lawful permanent resident and seven years of residence after admission in any status.[10] Applicants who have spent time in the United States as the unemancipated minor children of lawful permanent resident parents merely have an alternative mechanism to demonstrate that they satisfy these distinct requirements—a mechanism that is wholly consistent with, if not compelled by, the statutory scheme. *See Cuevas-Gaspar*, 430 F.3d at 1029 (noting the well-established "congressional policy of recognizing that presence in the United States of an extended length gives rise to such strong ties to the United States that removal would result in undue hardship"). Thus, allowing imputation to satisfy section 240A(a)(1)'s five-year requirement would not be contrary in any way to congressional intent.

    c.   *The BIA's Consistent Willingness To Impute in Other Contexts*

The government champions the BIA's assertion that its prior decisions do "not support the automatic imputation of lawful permanent resident status from parent to child," noting that the cases cited in *Cuevas-Gaspar* "all deal with aliens whose relatives abandoned their lawful permanent resident status and the resulting imputation of the abandonment of that status." 24 I. & N. Dec. at 234 n.4. The government identifies two reasons why this distinction is relevant.

First, the government notes that imputing the abandonment of permanent resident status is consistent with the "longstand-

---

[10]For example, an unemancipated minor who spent seven years in the United States with parents who had not attained lawful permanent resident status might be able to satisfy the seven-year requirement through imputation, but would not be able to satisfy the five-year requirement.

ing policy that a child cannot form the intent necessary to establish his or her own domicile." *Id.* This observation lacks relevance; it is a distinction that makes no difference. The argument appears to be that the abandonment of permanent resident status requires intent, and therefore imputation is appropriate, whereas the acquisition of permanent resident status does not require intent, so imputation is not appropriate. But we know of no authority for the proposition that intent, standing alone, is the touchstone of imputation analysis. In *Cuevas-Gaspar*, we dealt with a more cogent version of this argument. *See* 430 F.3d at 1025. There, we rejected the assertion that the status of "admission" could not be imputed because, "unlike domicile, which depends on intent or capacity, 'admission' does not depend on either intent or capacity." *Id.* As *Cuevas-Gaspar* suggests, it is unreasonable to impute the abandonment of permanent resident status while refusing to impute the acquisition of such status under section 240A(a). Indeed, while unemancipated minors may be technically capable of attaining lawful permanent resident status without their parents' assistance, it is not reasonable to expect them to do so. The imputation of both domicile and permanent resident status to minor children is appropriate, so far as cancellation of removal is concerned, "precisely because the minor either [is] legally incapable of satisfying one of these criteria or could not reasonably be expected to satisfy it independent of his parents." *Ramos Barrios*, No. 06-74983, at 6292-93.

Second, the government's insistence that "acquiring lawful permanent resident status, with the attendant eligibility requirements, is necessarily more complicated than abandoning such status," *In re Escobar*, 24 I. & N. Dec. at 234 n.4, is similarly not probative. As noted, there is no dispute that Escobar satisfied the "attendant eligibility requirements" to acquire permanent resident status. Moreover, the fact that it may be more complicated to acquire permanent resident status than to abandon it does not provide any indication as to whether imputation is more appropriate for one than the other.

If there is any reasonable conclusion to be drawn from that fact, it is that the complications associated with acquiring permanent resident status favor imputation, as minor children are less equipped to deal with those complications on their own.

**[11]** Accordingly, the BIA's explanation of its inconsistent imputation practices remains " 'so unclear or contradictory that we are left in doubt as to the reason for the change in direction.' " *Marmolejo-Campos v. Holder*, 558 F.3d 903, 914 (9th Cir. 2009) (en banc) (quoting *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc)). In light of this ill-explained and apparently arbitrary inconsistency, *Cuevas-Gaspar*'s interpretation of section 240A(a) continues to receive support from the observation that the BIA "repeatedly [has] held that a parent's status, intent, or state of mind is imputed to the parent's unemancipated minor child in many areas of immigration law, including asylum, grounds of inadmissibility, and legal residency status." *Cuevas-Gaspar*, 430 F.3d at 1024.

### d. *The BIA's Interpretation of Section 240A(a)(1) Is Unreasonable*

We acknowledge that, at *Chevron*'s second step, "[d]eference to an agency's interpretation is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." *Morales-Izquierdo*, 486 F.3d at 492 (internal quotation marks omitted). Further, "[a]t step two . . . our function is 'not simply [to] impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute.' " *Id.* at 492-93 (quoting *Chevron*, 467 U.S. at 843).

**[12]** With this framework in mind, *Cuevas-Gaspar* compels the conclusions that imputation under section 240A(a)(1) is

appropriate, and that a contrary interpretation of the statute is not permissible.[11] While agencies retain discretion to fill ambiguous statutory gaps, it does not follow that an agency may repeatedly put forward an interpretation that we already have examined under *Chevron* and found unreasonable at its second step.

**[13]** Moreover, the BIA's interpretation of the statute remains demonstrably contrary to the fundamental purposes motivating the discretionary relief Congress made available in section 240A(a). Escobar has spent almost her whole life within the United States. When Escobar was only thirteen and her mother attained lawful permanent resident status, Escobar easily could have adjusted her own status as well, with the assistance of her mother. Not only is it absurd to penalize Escobar for her mother's failure to include her in the adjustment process, but it flies in the face of common sense to conclude that a lawful permanent resident such as Escobar, who has spent more than two decades establishing a life in this country, cannot be eligible for cancellation of removal, which is premised on the longstanding "congressional policy of recognizing that presence in the United States of an extended length gives rise to such strong ties to the United States that removal would result in undue hardship." *Cuevas-Gaspar*, 430 F.3d at 1029 (citing S. Rep. No. 1515, 81st Cong., 2d Sess. 383 (1950)). Further, if Escobar had never attained lawful permanent resident status, her eligibility for cancellation of removal would have been governed by section 240A(b), under which she easily would have established that she had been "physically present in the United States for a continuous period of not less than 10 years." 8 U.S.C. § 1229b(b)(1)(A).

---

[11]It is noteworthy that at least one member of the BIA has also reached this conclusion, albeit in an unpublished decision. *See In re Guerra*, No. A77 988 500, 2007 WL 1129369 (BIA Feb. 13, 2007). We note also that the Third Circuit recently repudiated the logic and holding of *Cuevas-Gaspar*. *See Augustin v. Attorney Gen.*, 520 F.3d 264 (3d Cir. 2008). We are nonetheless bound to follow our circuit precedent.

Accordingly, we hold that, for purposes of satisfying the five years of lawful permanent residence required under INA section 240A(a)(1), 8 U.S.C. § 1229b(a)(1), a parent's status as a lawful permanent resident is imputed to the unemancipated minor children residing with that parent.

### e. Brand X *and* Duran Gonzales *Do Not Alter Our Analysis at* Chevron's *Second Step*

The BIA recently relied on *In re Escobar* to deny imputation for section 240A(a)(2)'s seven-year requirement within our circuit, directly conflicting with our holding in *Cuevas-Gaspar*. *See Matter of Ramirez-Vargas*, 24 I. & N. Dec. 599 (BIA 2008). In *Matter of Ramirez-Vargas*, the BIA applied the Supreme Court's decision in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005) ("*Brand X*"),[12] and our decision in *Duran Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007),[13] to conclude that its subsequent interpretation of section 240A(a) in *In re Escobar* had undermined the precedential value of *Cuevas-Gaspar*. *See Matter of Ramirez-Vargas*, 24 I. & N. Dec. at 599. We disagree.

---

[12]In *Brand X*, the Supreme Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. at 982.

[13]In *Duran Gonzales*, we considered a conflict between our interpretation of certain provisions of IIRIRA in *Perez-Gonzalez v. Ashcroft*, 379 F.3d 783 (9th Cir. 2004), and the BIA's subsequent interpretation of the same provisions in *In re Torres-Garcia*, 23 I. & N. Dec. 866 (BIA 2006). Relying on *Brand X*, 545 at 980-82, we determined that so long as *Perez-Gonzalez* was "based, at least in part, on ambiguity in the applicable statutes," our deference to the BIA's interpretation was required. *Duran Gonzales*, 508 F.3d at 1236. After ascertaining that, "despite some language to the contrary, *Perez-Gonzalez* was based on a finding of statutory ambiguity that left room for agency discretion," *id.* at 1237, we concluded we were not bound by *Perez-Gonzalez* but "must defer to *In re Torres-Garcia if its interpretation of the governing statute is reasonable*," *id.* at 1239 (emphasis added).

The BIA's reliance on *Brand X* and *Duran Gonzales* in *Matter of Ramirez-Vargas* is misplaced. Most notably, in *Brand X* itself, in reaching the prior decision at issue, *AT&T Corp. v. Portland*, 216 F.3d 871 (9th Cir. 2000), our court had not even considered an agency interpretation of the Communications Act, nor had we applied *Chevron* deference when we interpreted the statute. *See id.* at 876 ("We note at the outset that the FCC has declined, both in its regulatory capacity and as amicus curiae, to address the issue before us. Thus, we are not presented with a case involving potential deference to an administrative agency's statutory construction pursuant to the *Chevron* doctrine."). Indeed, the FCC was not even a party to *Portland*. *See Brand X*, 545 U.S. at 980. Accordingly, when we authored the decision that the Supreme Court reversed in *Brand X*, we did not employ a deferential review of an agency interpretation at *Chevron*'s second step. *See Brand X Internet Servs. v. FCC*, 345 F.3d 1120, 1130-32 (9th Cir. 2003), *rev'd*, 545 U.S. 967 (2005). Rather, as the Supreme Court observed, we "declined to apply *Chevron* because [we] thought the Commission's interpretation of the Communications Act [was] foreclosed by the conflicting construction of the Act [we] had adopted in *Portland*." *Brand X*, 545 U.S. at 982.

Similarly, in *Duran Gonzales*, we observed that our previous decision in *Perez-Gonzalez* had "clearly relied on the agency regulations to reconcile the inadmissibility provision with the special adjustment provision." 508 F.3d at 1238. Thus, *Perez-Gonzalez* "did not 'foreclose[ ] the agency's interpretation' of the statutory scheme, but rather relied on the regulations to both reject an informal agency interpretation of the inadmissibility provision and reach [its] holding." *Id.* at 1238 (quoting *Brand X*, 545 U.S. at 983). Accordingly, our conclusion in *Duran Gonzales* that the BIA's new interpretation of these regulations was "clearly reasonable" did not directly contravene the *Perez-Gonzalez* analysis, which was premised on a different interpretation of the same underlying regulations. *See id.* at 1242; *see also Perez-Gonzalez*, 379

F.3d at 794 ("In the absence of a more complete agency elaboration of how its interpretation of § 212(a)(9) can be reconciled with its own regulations, we must defer to the regulations rather than to the informal guidance memorandum.").

**[14]** In sum, neither *Brand X* nor *Duran Gonzales* suggests that an agency may resurrect a statutory interpretation that a circuit court has foreclosed by rejecting it as unreasonable at *Chevron*'s second step.[14] As both *Brand X* and *Duran Gonzales* acknowledged, under *Chevron*, an agency's interpretation of a statute it is charged with administering must be reasonable. *See Brand X*, 545 U.S. at 997-1000; *Duran Gonzales*, 508 F.3d at 1241-42. In contrast to the prior decisions at issue in *Brand X* and *Duran Gonzales*, the *Cuevas-Gaspar* panel considered and rejected the precise interpretation of section 240A(a) that the BIA resurrected in *In re Escobar* and extended in *Matter of Ramirez-Vargas*. Our assessment of *In re Escobar* therefore remains bound by the ongoing validity of our holding in *Cuevas-Gaspar*.

---

[14]Indeed, the *Brand X* majority's reasoning confirms this conclusion. After pronouncing its general holding that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision . . . follows from the unambiguous terms of the statute," 545 U.S. at 982, the Court observed:

> A contrary rule would produce anomalous results. It would mean that whether an agency's interpretation of an ambiguous statute is entitled to *Chevron* deference would turn on the order in which the interpretations issue: If the court's construction came first, its construction would prevail, whereas if the agency's came first, the agency's construction would command *Chevron* deference.

*Id.* at 983. Thus, because the BIA interpreted section 240A(a) before we did, and this interpretation has already received *Chevron* deference, the underlying concerns motivating *Brand X* are simply inapposite.

## B.    The Motion to Reopen

**[15]** Escobar concedes that her motion to reopen was untimely. Absent exceptional circumstances, the untimeliness of a motion to reopen bars consideration of the merits, because we lack jurisdiction to consider whether the BIA properly refused to reopen a case sua sponte. *Toufighi v. Mukasey*, 538 F.3d 988, 993 (9th Cir. 2008). Escobar has failed to demonstrate exceptional circumstances.

Escobar argues that we should follow *Cardoso-Tlaseca* in reaching the merits of her motion. In *Cardoso-Tlaseca*, we granted and remanded a petition for review in which the petitioner faced removal on the basis of a conviction that had been subsequently vacated and expunged. *See* 460 F.3d at 1104-05. The BIA had denied the petitioner's motion to reopen on the ground that it lacked jurisdiction under 8 C.F.R. § 1003.2(d) because the petitioner had departed from the United States. *Id.* at 1105. Because the subsequently vacated "conviction was a 'key part' of the government's case" for removal, *id.* at 1107, we remanded to the BIA "for a determination whether [the] original conviction was vacated on the merits or because of immigration consequences," *id.* at 1108.

*Cardoso-Tlaseca* is inapposite. Escobar's new legal theory is not comparable to a vacated conviction, particularly because this theory did not arise from a change in law or newly discovered evidence. On the contrary, the argument was available from the outset of Escobar's removal proceedings. Moreover, the BIA denied Cardoso-Tlaseca's motion to reopen because he had left the United States, not because his petition was untimely.

**[16]** Escobar also has not satisfied any of the well-established grounds warranting equitable tolling of the deadline to file a motion to reopen. *See Iturribarria v. INS*, 321 F.3d 889, 897 (9th Cir. 2003) ("This court . . . recognizes equitable tolling of deadlines and numerical limits on motions

to reopen or reconsider during periods when a petitioner is prevented from filing because of deception, fraud, or error, as long as the petitioner acts with due diligence in discovering the deception, fraud, or error."). Escobar can point to no "deception, fraud, or error" that delayed her motion to reopen. *See id.* Accordingly, the BIA did not abuse its discretion in denying this motion as untimely.

### CONCLUSION

Viewing section 240A within the context of the INA, *Cuevas-Gaspar* compels the conclusion that the BIA's interpretation of section 240A(a)(1) is unreasonable. It is perhaps worth noting that, in so holding, we do not guarantee that Escobar and others in her situation may remain in the United States. On the contrary, we merely grant access to the possibility of cancellation of removal, leaving the ultimate determination to the sound discretion of the Attorney General.

We further conclude that the BIA did not abuse its discretion in denying Escobar's motion to reopen as untimely.

**PETITION No. 07-72843 GRANTED and REMANDED for further proceedings consistent with this opinion; PETITION No. 08-71777 DISMISSED.**

---

GRABER, Circuit Judge, concurring:

I concur fully in Judge Wardlaw's opinion. I write separately to express my concern with both the BIA's current rule and our holding in *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013 (9th Cir. 2005).

To qualify for cancellation of removal, a person must have had permanent resident status for five years, 8 U.S.C. § 1229b(a)(1), and must have had continuous residence under

"any" legal immigration status for seven years, *id.* § 1229b(a)(2). The Board of Immigration Appeals ("BIA") has interpreted those requirements strictly: A parent's legal status cannot be imputed to a child.

The BIA's rule is undeniably harsh. Its effect is to remove children who have lived in the United States for at least seven years and whose parents have had permanent resident status for at least five years. Moreover, the children may have arrived here at a very young age and have no ties to the designated country of removal. The children may not speak the language, know anyone there, or have any connection other than the country name on their birth certificates. The BIA's rule faults these children because their parents, for whatever reason, chose not to seek legal status for the children at the same time that they themselves sought legal status.

In *Cuevas-Gaspar*, 430 F.3d at 1021-29, we declined to afford the BIA's interpretation of the seven-year continuous residence requirement deference under the second step of *Chevron* analysis because, in our view, the BIA's interpretation was unreasonable. Here, the BIA held that it would not "extend" our holding in *Cuevas-Gaspar* to the five-year permanent residence requirement. *In re Escobar*, 24 I. & N. Dec. 231, 235 (B.I.A. 2007). But, for present purposes, there is no relevant distinction between a parent's status for the five-year permanent residence requirement and a parent's status for the seven-year continuous residence requirement. For the reasons expressed in the opinion, *Cuevas-Gaspar* controls and we must conclude that the BIA's interpretation is unreasonable.

Despite the harshness of the BIA's current rule, and despite the equal or greater reasonableness of a less harsh rule, I think that, as a matter of statutory interpretation and *Chevron* deference, *Cuevas-Gaspar* was wrongly decided. If not for *Cuevas-Gaspar*, I would conclude that, under the demanding standard of *Chevron* deference, the BIA's interpretation is reasonable. I am not alone. *See Cuevas-Gaspar*, 430 F.3d at 1031-32

(Fernandez, J., dissenting); *Augustin v. Attorney Gen.*, 520 F.3d 264, 269-72 (3d Cir. 2008) (disagreeing with *Cuevas-Gaspar* and holding to the contrary). Judge Fernandez' dissent in *Cuevas-Gaspar* and the Third Circuit's unanimous decision in *Augustin* aptly explain why the BIA's interpretation is reasonable when considering *Chevron* deference. That conclusion is particularly warranted because "judicial deference to the Executive Branch is especially appropriate in the immigration context." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *see also Chen v. Mukasey*, 524 F.3d 1028, 1033 (9th Cir. 2008) ("Deference is especially appropriate in the context of immigration law, where national uniformity is paramount." (internal quotation marks omitted)).[1]

Were the question not already decided by *Cuevas-Gaspar*, then, I would feel constrained as a judge to defer to the BIA's interpretation of the statute. Unless and until the BIA reverses course or Congress fills the gap in the immigration laws, we must defer to the agency's expertise—my personal misgivings notwithstanding.

---

[1]The BIA has stated that it "will . . . not follow [*Cuevas-Gaspar*] in cases arising outside the jurisdiction of the Ninth Circuit." *In re Escobar*, 24 I. & N. Dec. at 235. Thus, its rule is uniform everywhere except the Ninth Circuit.