**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGEL WILFREDO RAMOS BARRIOS,
                        *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                        *Respondent.*

No. 06-74983

Agency No.
A078-311-822

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order
of the Board of Immigration Appeals

Submitted December 8, 2008*
Pasadena, California

Filed May 27, 2009
Amended June 26, 2009
Second Amendment September 10, 2009

Before: Before: Jerome Farris, Susan P. Graber,** and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

**Judge Susan P. Graber was drawn to replace Judge William W
Schwarzer pursuant to General Order 3.2(g). Judge Graber has read the
briefs and reviewed the record.

13009

## COUNSEL

Areg Kazaryan, Law Offices of Areg Kazaryan, Glendale, California, for petitioner Angel Wilfredo Ramos Barrios.

John W. Blakely, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for respondent Attorney General Holder.

## ORDER

The opinion filed May 27, 2009, and amended June 26, 2009, is further amended as follows:

*Slip op. at 8044*:

Replace <*Escobar v. Holder*, Nos. 07-72843, 08-71777 (9th Cir. 2009)> with <*Mercado-Zazueta v. Holder*, No. 07-71428 (9th Cir. 2009)>.

After <a parent's status as a lawful permanent resident is imputed to the unemancipated minor children residing with that parent.">, replace <*Id.* at 6209.> with <*Id.* at 12617.>.

*Slip op. at 8044 n. 16*:

Replace <*Escobar* had not yet been published when the parties filed their briefs.> with <*Mercado-Zazueta* had not yet been published when the parties filed their briefs.>.

*Slip op. at 8045*:

Replace <*Escobar* ("lawfully admitted for permanent residence")> with <*Mercado-Zazueta* ("lawfully admitted for permanent residence")>.

*Slip op. at 8046*:

Replace <*Escobar* followed directly from *Lepe-Guitron* and *Cuevas-Gaspar*.> with <*Mercado-Zazueta* followed directly from *Lepe-Guitron* and *Cuevas-Gaspar*.>.

Replace <and "admitted in any status," *Escobar*, Nos. 07-72843, 08-71777, at 6202-03.> with <and "lawfully admitted," *Mercado-Zazueta*, No. 07-71428, at 12609-10.>.

Replace <imputation . . . is appropriate." *Id.* at 6207-08.> with <imputation . . . is appropriate." *Id.* at 12614.>.

*Slip op. at 8047*:

Replace <Unlike the petitioners in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Escobar*> with <Unlike the petitioners in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Mercado-Zazueta*>.

*Slip op. at 8047 n.18*:

Replace <*Lepe-Guitron*, *Cuevas-Gaspar*, and *Escobar*> with <*Lepe-Guitron*, *Cuevas-Gaspar*, and *Mercado-Zazueta*>.

*Slip op. at 8049*:

Replace <articulated in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Escobar*> with <articulated in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Mercado-Zazueta*>.

The mandate shall issue forthwith upon the filing of this order. Petitioner's motion to extend the July 9, 2009, order holding the mandate in abeyance is denied as moot. No further petitions for rehearing or rehearing en banc shall be entertained by this panel.

---

## OPINION

WARDLAW, Circuit Judge:

Angel Wilfredo Ramos Barrios ("Ramos"), a native and citizen of Guatemala, petitions for review of the Board of Immigration Appeals' ("BIA") affirmance of the immigration judge's ("IJ") denial of his application for asylum, withholding of removal, relief under the Convention Against Torture ("CAT"), and special rule cancellation of removal under section 203 of the Nicaraguan Adjustment and Central American Relief Act ("NACARA" or "the Act"). Following our recent precedent, we hold that Ramos is ineligible for asylum and

withholding of removal because his refusal to join a gang does not make him a member of a particular social group or constitute a political opinion. We also hold as a matter of first impression that Ramos is not entitled to NACARA relief because a minor who seeks relief as a derivative must personally satisfy the Act's requirement of seven years of continuous physical presence. Ramos's father's physical presence in the United States cannot be imputed to him to satisfy this requirement. We do not reach Ramos's CAT claim because it was waived. We have jurisdiction pursuant to 8 U.S.C. § 1252, and we deny the petition.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Ramos entered the United States on December 18, 2001, without being admitted or paroled. The next day, the former Immigration and Naturalization Service ("INS") issued Ramos a Notice to Appear, charging him with inadmissibility in accordance with 8 U.S.C. § 1182(a)(6)(A)(i), and placed him in removal proceedings. On November 1, 2002, Ramos filed an application for asylum, withholding of removal, and CAT relief. He also submitted an application for special rule cancellation of removal pursuant to section 203 of NACARA.

Ramos was the sole witness at the merits hearing before the IJ. He admitted the factual allegations and conceded inadmissibility. As to his claims for relief, Ramos testified that he had been threatened by a gang, or "mara," while attending school in Guatemala.[1] The gang members wanted Ramos to join the gang, but he refused. As a result, the gang members "continued to threaten [him] and started to steal things from [him]."

---

[1]During his testimony before the IJ, Ramos did not give the name of a particular gang; rather, he referred generally to "the gang" or "the mara." He conceded in his brief before the BIA that he could not specifically identify the gang that recruited him. He suggested, however, that it was either "Mara 18" or "Mara 13," which are rival youth gangs in Central America.

On one occasion, they cut his neck with a switchblade when he would not give them his lunch money. The gang members told him "[it] was a sign as to what could happen to [him]." Ramos did not report the incidents to the police because the gangs had warned him that if he told anyone, "they were going to do something" to him or his family. He did tell his family and two of his teachers about the threats, but they took no action because, according to Ramos, they were also afraid.

Believing his life was in danger on account of the threats, Ramos left Guatemala in December 2001. Since arriving in the United States, he has spoken to family members who remained in Guatemala.[2] They told him that the gang members had passed by the house in which Ramos formerly lived, asking about and threatening him. Ramos testified that he is scared to return to Guatemala, fearing that "it would go back to the same thing and that [the gangs] will no longer threaten, but something would actually happen."

The IJ accepted Ramos's testimony as true but nevertheless denied all forms of relief. On appeal to the BIA, a one-member panel adopted and affirmed the IJ's decision, citing *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994). Ramos timely petitions for review.

## II.  STANDARD OF REVIEW

When the BIA cites *Burbano* "and does not express disagreement with any part of the IJ's decision, the BIA adopts the IJ's decision in its entirety." *Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc). "In citing *Burbano*, [t]he BIA thereby signaled that it had conducted an indepen-

---

[2]Ramos's mother and two older brothers still live in Guatemala. His brothers do not live in the house in which Ramos formerly lived with his mother. He testified that his brothers have not experienced any problems with the gangs, nor have the gang members harmed any of his other family members.

dent review of the record and had exercised its own discretion in determining that its conclusions were the same as those articulated by the IJ." *Arreguin-Moreno v. Mukasey*, 511 F.3d 1229, 1232 (9th Cir. 2008) (alteration in original) (internal quotation marks omitted).

We review questions of law de novo, *Cerezo v. Mukasey*, 512 F.3d 1163, 1166 (9th Cir. 2008), except to the extent that deference is owed to the BIA's determination of the governing statutes and regulations, *Simeonov v. Ashcroft*, 371 F.3d 532, 535 (9th Cir. 2004). Factual findings are reviewed for substantial evidence. *Zehatye v. Gonzales*, 453 F.3d 1182, 1184-85 (9th Cir. 2006). When neither the IJ nor the BIA makes an adverse credibility finding, we must accept a petitioner's testimony before the IJ as true. *Lim v. INS*, 224 F.3d 929, 933 (9th Cir. 2000).

## III. DISCUSSION

### A. Asylum and Withholding of Removal

**[1]** The Attorney General may grant asylum to an alien who "is unable or unwilling to return to . . . [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *id.* § 1158(b)(1)(A); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). The source of the persecution must be a government official or an individual or group that "the government is unwilling or unable to control." *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000) (internal quotation marks omitted). To qualify for withholding of removal, an alien must demonstrate that there is a clear probability that he will be subject to such persecution. *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). An alien who fails to satisfy the lower standard of proof required to establish eligibility for asylum necessarily fails to establish eligibil-

ity for withholding of removal. *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003).

[2] Ramos argues that he was persecuted on account of two protected grounds: (1) membership in a particular social group—namely, young males in Guatemala who are targeted for gang recruitment but refuse because they disagree with the gang's criminal activities; and (2) an "anti-gang opinion" that was political in nature, insofar as "gang activity affects the administration of the government and the country." We recently have held, however, that resistance to gang membership is not a protected ground. *Ramos-Lopez v. Holder*, No. 06-72402, 2009 WL 1012062, at *2-*6 (9th Cir. Apr. 16, 2009).[3]

---

[3]We first considered the question of whether resistance to gang membership is a protected ground in *Santos-Lemus v. Mukasey*, 542 F.3d 738 (9th Cir. 2008). The petitioner in *Santos-Lemus* presented the same two arguments that Ramos raises before us. *See id.* at 744-47. We held that young men in El Salvador who resist gang violence do not constitute a particular social group, nor does such resistance constitute an actual or imputed political opinion. *Id.* at 746-47.

Our recent decision in *Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) (en banc), however, requires us to rethink our approach—but not our conclusion—in *Santos-Lemus*. In *Marmolejo-Campos*, we held that the BIA's interpretation of the term "moral turpitude" was entitled to *Chevron* deference because the term is ambiguous and the BIA had exercised its authority to give the term concrete meaning through case-by-case adjudication. *Id.* at 911-12; *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). By the time we decided *Santos-Lemus*, the BIA had already published a precedential opinion that was directly on point—*Matter of S-E-G-*, 24 I. & N. Dec. 579 (BIA 2008). Although we reached the same conclusion as *Matter of S-E-G-* and found its analysis "particularly helpful," we noted that the BIA's decision "[was] not binding on us." *Santos-Lemus*, 542 F.3d at 745. *Marmolejo-Campos* effectively calls this reasoning into question. We explained the apparent conflict in *Ramos-Lopez*:

[In *Santos-Lemus*,] [w]e did not analyze the BIA's decision [in *Matter of S-E-G-*] under the *Chevron* framework . . . . We decided *Santos-Lemus*, however, before our en banc decision in *Marmolejo-Campos*, in which we clarified the method by which

In *Ramos-Lopez*, we held that "young Honduran men who have been recruited by gangs but refuse to join do not constitute a particular social group." *Id.* at *6. Applying *Chevron* deference, we concluded that the BIA's precedential decision in *Matter of S-E-G-* "is not arbitrary and capricious." *Id.* at *5. We noted that the BIA's decision analyzed the purported social group using the factors set forth in our prior case law. *Id.* at *4. Upon reviewing its analysis, we determined that the BIA reasonably found "that the group was not sufficiently particular" and "that the group lacked social visibility." *Id.* at *5.

**[3]** Ramos's argument that young men in Guatemala who resist gang recruitment constitute a social group is indistinguishable from the argument made in *Ramos-Lopez*.[4] Accordingly, we must reject Ramos's argument for the reasons explained in that case. *See id.* at *4-*6.

---

we determine the degree of deference owed to BIA decisions. Thus, to the extent *Santos-Lemus* is inconsistent with *Marmolejo-Campos*, the later en banc decision must control.

2009 WL 1012062, at *4 n.4 (citations omitted).

Although *Matter of S-E-G* was published almost two years after the BIA's unpublished decision in the case before us, we apply *Chevron* deference to the BIA's precedential decision for the reasons explained in *Ramos-Lopez. See id.* at *3. We note, however, that we would reach the same conclusion using the analytical approach set forth in either *Santos-Lemus* or *Ramos-Lopez*.

[4]That we addressed resistance to a gang in Honduras, not Guatemala, in *Ramos-Lopez* does not alter our conclusion here. We specifically noted in *Ramos-Lopez* that *Matter of S-E-G-* could not be distinguished on this ground. *See Ramos-Lopez*, 2009 WL 1012062, at *4 ("[W]e recognize that [*Matter of S-E-G-*] specifically addresses resistance to recruitment by the [Mara Salvatrucha]-13 in El Salvador, not Honduras. The BIA, however, expected its decision to apply to the same group in Honduras."). The BIA's reasoning in *Matter of S-E-G-* is no less applicable to the Mara 13 (or an equivalent gang) in Guatemala. Because Ramos claims persecution by either the Mara 13 or a rival Central American gang, our decision in *Ramos-Lopez* controls.

We also addressed in *Ramos-Lopez* whether the petitioner had been persecuted on account of an anti-gang political opinion. *Id.* at *6. Turning again to *Matter of S-E-G-*, we deferred under *Chevron* "to the BIA's reasonable interpretation of 'political opinion' for the same reason we defer[red] to the BIA's reasonable interpretation of 'particular social group.' " *Id.* We also relied on our decision in *Santos-Lemus*.[5] *Id.*

**[4]** In *Santos-Lemus*, we found that the petitioner had "provided no evidence that his opposition to the gang's criminal activity was based on political opinion [or] . . . that he was politically or ideologically opposed to the ideals espoused by the Mara or to gangs in general." 542 F.3d at 747. Rather, the available evidence suggested "that Santos-Lemus was victimized for economic and personal reasons." *Id.* We held that "[t]hese motivations do not constitute persecution on account of political opinion." *Id.* We also rejected Santos-Lemus's contention that he was persecuted on account of an imputed political opinion, reasoning that "Santos-Lemus neither stated in his application for asylum, nor in his testimony at his hearing, that he . . . refused to join the gang," and that no evidence suggested "that the gang held any sort of belief system that they perceived Santos-Lemus to oppose." *Id.* Accordingly, we affirmed the BIA's determination that "a general aversion to gangs does not constitute a political opinion for asylum purposes." *Id.*

We concluded that Ramos-Lopez's case was indistinguish-

---

[5]In *Ramos-Lopez*, we noted that we deferred in *Santos-Lemus* "to the BIA's determination that 'resistance to a gang's recruitment efforts alone does not constitute political opinion.' " 2009 WL 1012062, at *6 (alterations omitted) (quoting *Santos-Lemus*, 542 F.3d at 747). We did not, however, apply *Chevron* deference in *Santos-Lemus* in holding that the petitioner was not persecuted on account of his political opinion. Rather, we merely noted that the BIA had reached the same conclusion in *Matter of S-E-G*. *See Santos-Lemus*, 542 F.3d at 747. Because Santos-Lemus had not exhausted this claim before the BIA and, in any event, it was "wholly unsupported by the record," we readily rejected it. *Id.*

able. 2009 WL 1012062, at *6. Because Ramos-Lopez "allege[d] no facts in support of a political opinion, actual or imputed, beyond his refusal to join the [gang]," we found that he had failed to prove persecution on account of a protected ground. *Id.*

[5] Here, Ramos similarly failed to present evidence that he was politically or ideologically opposed to the ideals espoused by the gang that recruited him (or to gangs in general), or that the gang imputed to him any particular political belief. The evidence instead supports the conclusion that the gang victimized him for economic and personal reasons. That gang members attacked Ramos and cut his neck just after unsuccessfully trying to rob him reinforces this conclusion. Although Ramos did state in his asylum application that he refused to join the gang, this fact alone does not save his claim. Santos-Lemus's failure to state in his application or during his hearing that he refused to join the gang was not the dispositive factor for rejecting his claim. *See* 542 F.3d at 746-47. We therefore reject Ramos's argument that he was persecuted on account of a political opinion for the reasons explained in *Ramos-Lopez* and *Santos-Lemus*.

[6] Because Ramos failed to demonstrate that he was persecuted on account of a protected ground, we deny the petition as to his asylum and withholding of removal claims.[6]

---

[6]We therefore do not address Ramos's remaining arguments as to asylum and withholding of removal. Nor do we reach Ramos's claim for CAT relief. He waived this claim by failing to include it in his opening appellate brief. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("[A]n issue referred to in the appellant's statement of the case but not discussed in the body of the opening brief is deemed waived."). Even if Ramos had not waived this claim, we would reject it on the merits because the injuries he suffered do not rise to the level of torture, *see Kumar v. Gonzales*, 444 F.3d 1043, 1055-56 (9th Cir. 2006), and he failed to meet the heavy burden of proving that it is more likely than not that he will be tortured upon removal to Guatemala, *see Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001).

**B. Relief Under NACARA**

Ramos argues that the BIA erred in concluding that he is ineligible for NACARA relief on the grounds that (1) special rule cancellation of removal ("special rule cancellation") requires seven years of continuous physical presence for the minor children of NACARA beneficiaries; and (2) Ramos's father's physical presence cannot be imputed to him to satisfy this requirement. We agree with the BIA.

1. *Section 203 of NACARA*

**[7]** On November 19, 1997, President Clinton signed into law NACARA, Pub. L. No. 105-100, 111 Stat. 2160, 2193-2201 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644, 2644-45 (1997). NACARA provides various forms of immigration benefits and relief from removal to certain Guatemalans and nationals of other Central American and former Soviet Bloc countries. Section 203 of NACARA allows qualified individuals to apply for special rule cancellation under the more lenient standards that existed before the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009. *See Albillo-De Leon v. Gonzales*, 410 F.3d 1090, 1093 (9th Cir. 2005); *Munoz v. Ashcroft*, 339 F.3d 950, 955-56 (9th Cir. 2003). Agency regulations interpreting special rule cancellation closely track the text of IIRIRA and NACARA. *See* 8 C.F.R. §§ 1240.61, .66.

2. *Whether Ramos Satisfies One of the Threshold Requirements*

**[8]** To qualify for special rule cancellation, an applicant first must show that he falls into one of the five groups identified in 8 C.F.R. § 1240.61(a).[7] As an initial matter, we must

---

[7]Section 1240.61(a) implements section 309(c)(5)(C)(i) of IIRIRA, as amended by section 203 of NACARA.

briefly address whether we have jurisdiction to consider the BIA's ruling that Ramos failed to satisfy one of these threshold requirements. We hold that we do. Section 309(c)(5)(C)(ii) of IIRIRA, as amended by section 203(b) of NACARA, appears to limit our jurisdiction to review an agency's determination that an applicant failed to satisfy one of the threshold requirements set forth in section 309(c)(5)(C)(i). However, "section 106 of the Real ID Act of 2005 restored our jurisdiction over 'constitutional claims or questions of law' raised in a petition for review." *Dhital v. Mukasey*, 532 F.3d 1044, 1049 (9th Cir. 2008) (per curiam). In *Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007) (per curiam), we held that such questions of law include "not only 'pure' issues of statutory interpretation, but also application of law to undisputed facts, sometimes referred to as mixed questions of law and fact." *Id.* at 648; *see also Khunaverdiants v. Mukasey*, 548 F.3d 760, 765 (9th Cir. 2008); *Ghahremani v. Gonzales*, 498 F.3d 993, 998-99 (9th Cir. 2007). Because the IJ accepted Ramos's testimony as true and none of the facts pertaining to Ramos's NACARA application is in dispute, we have jurisdiction to consider whether the BIA properly applied the law.

**[9]** We conclude that the BIA erred in adopting the IJ's conclusion that Ramos failed to satisfy one of the threshold requirements. Ramos stated in his NACARA application and argued to the IJ that he was eligible for relief under section 1240.61(a)(4). The IJ acknowledged this fact during an initial hearing. Addressing Ramos's counsel, he stated: "You're arguing that [Ramos] falls under the fourth paragraph [of section 1240.61(a)], which is that he is the child of a person who is applying for NACARA." Subsection (a)(4) provides that "[a]n alien who is the spouse or child of an individual described in paragraph (a)(1), (a)(2), or (a)(3) of this section at the time a decision is made to suspend the deportation, or cancel the removal, of the individual described in paragraph (a)(1), (a)(2), or (a)(3)" is eligible for special rule cancellation, subject to certain exceptions not relevant here. 8 C.F.R. § 1240.61(a)(4). Subsections (a)(1) through (3) classify the

individual aliens who qualify for suspension of deportation or special rule cancellation. Despite the IJ's acknowledgment that Ramos claimed relief under subsection (a)(4), the IJ mistakenly analyzed Ramos's claim under subsection (a)(5). Subsection (a)(5) applies only to an applicant who "is 21 years of age or older at the time a decision is made to [grant NACARA relief to the applicant's parent]," *id.* § 1240.61(a)(5)(i), and requires a showing that the applicant "[e]ntered the United States on or before October 1, 1990," *id.* § 1240.61(a)(5)(ii). This subsection is plainly inapplicable because, as the IJ found, Ramos was only seventeen years old when he applied for NACARA relief. Therefore, subsection (a)(4) applies, which Ramos undoubtedly satisfies based on the facts found by the IJ.[8]

[10] Ramos's father, Roberto Ramos Chamale ("Chamale"), was granted NACARA relief in the form of permanent resident status on May 25, 2004.[9] Moreover, Ramos qualifies as Chamale's "child" as defined in 8 U.S.C. § 1101(b)(1). Ramos therefore was eligible for NACARA relief subject to meeting the physical presence requirement.

### 3. *Whether Ramos Satisfies the Physical Presence Requirement*

[11] To establish eligibility for special rule cancellation under the amended version of section 309(f)(1) of IIRIRA, the

---

[8]Because the IJ already made the predicate factual findings, we need not remand under *INS v. Ventura*, 537 U.S. 12 (2002) (per curiam). Further, we note that the government did not request a *Ventura* remand for the IJ to apply (a)(4) instead of (a)(5). Indeed, the question of Ramos's threshold eligibility for NACARA relief has never been contested.

[9]Chamale's NACARA application indicates that he qualified for relief pursuant to section 1240.61(a)(1). The IJ suggested, however, that he qualified under subsection (a)(2). Neither party addressed this issue in its briefs. Because it is undisputed that Chamale was granted NACARA relief under one of the first three subsections of 8 C.F.R. § 1240.61(a), we need not resolve this issue.

applicant must be "described in [section 309](c)(5)(C)(i)" and must establish the requisite physical presence.[10] This physical presence requirement is set forth in 8 C.F.R. § 1240.66(b)(2)[11] : "The alien has been physically present in the United States for a continuous period of 7 years immediately preceding the date the application was filed." It is undisputed that Ramos did not personally meet this requirement.

### a. *Applicability of the Physical Presence Requirement*

Ramos first disputes that special rule cancellation requires seven years of physical presence for the minor children of NACARA beneficiaries. He notes that the amended version of section 309(c)(5)(C)(i)(III) of IIRIRA does not include a physical presence requirement, and contends that Form I-881, the NACARA application, confirms this interpretation of the Act. Although Ramos accurately describes subsection III, he fails to consider section 309 in its entirety. The amended section 309(f)(1) expressly states that an applicant must be "described in [section 309](c)(5)(C)(i) . . . *and* . . . ha[ve] been physically present in the United States for a continuous period of not less than 7 years immediately preceding the date of such application." 111 Stat. 2198 (emphasis added). Form I-881 exactly mirrors the wording of section 309, and thus is of little aid to Ramos's argument.

[12] Ramos also incorrectly suggests that the regulations themselves support his interpretation. Section 1240.66 unequivocally states that to be eligible for NACARA relief, an applicant "must be described in § 1240.61" and must satisfy the physical presence requirement. 8 C.F.R. § 1240.66(a), (b)(2). The relevant legislative history also undermines Ramos's argument that there is no seven-year physical pres-

---

[10]Section 309(f)(1) of IIRIRA includes other eligibility requirements that are not at issue here.

[11]Section 1240.66 (b)(2) implements section 309(f)(1)(A)(ii) of IIRIRA, as amended.

ence requirement for derivative NACARA applicants. *See, e.g.*, 143 Cong. Rec. S12265-01, S12266-67 (daily ed. Nov. 9, 1997) (Explanatory Memorandum Regarding Title II of the D.C. Appropriations Potion [sic] of the Omnibus Appropriations Bill Submitted by Messrs. Mack, Graham, Abraham, Kennedy, and Durbin) (section-by-section analysis of NACARA). We therefore hold that a minor who qualifies for NACARA relief as a derivative under 8 C.F.R. § 1240.61(a)(4) must satisfy the seven-year physical presence requirement set forth in 8 C.F.R. § 1240.66(b)(2).

### b.  *Imputation of a Parent's Physical Presence for Purposes of NACARA Relief*

Ramos would satisfy the physical presence requirement if his father's physical presence in the United States were imputable to him for purposes of NACARA relief. For the reasons explained below, we hold that it is not.

### (i)  Deference to the BIA

We must first consider the level of deference, if any, owed to the IJ's determination and the BIA's adoption of the rule disallowing imputation. A single-member BIA panel affirmed the IJ's decision in an unpublished, nonprecedential decision.[12] Such decisions are entitled to only *Skidmore*,[13] rather than

---

[12]The BIA has not addressed in a published (or unpublished) opinion whether a parent's physical presence may be imputed to his child for purposes of NACARA relief. The single-member BIA panel that affirmed the IJ's decision should have referred the appeal to a three-member panel, as it presented the need to establish precedent construing the meaning of the amended section 309(f)(1) of IIRIRA. *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012-13 (9th Cir. 2006) (holding that "[a] case must be decided by a three-member panel [of the BIA] if it presents '[t]he need to establish a precedent construing the meaning of laws, regulations, or procedures'" (third alteration in original) (quoting 8 C.F.R. § 1003.1(e)(6)(ii)).

[13]*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

*Chevron*, deference. *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1013-15 (9th Cir. 2006). In *Skidmore*, the Supreme Court held that a nonbinding administrative interpretation carries a weight "depend[ent] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140; *see United States v. Mead Corp.*, 533 U.S. 218, 237-38 (2001) (holding that *Skidmore* remained intact after *Chevron* and that *Skidmore* deference applies when *Chevron* deference does not). If the reasons provided by the BIA to support its conclusion are not persuasive, then we must review de novo the question before us. *Garcia-Quintero*, 455 F.3d at 1015.

The BIA did not even address Ramos's imputation argument, nor did it provide any reasoning for its determination that Ramos failed to meet the physical presence requirement. Moreover, it did not cite any precedent of the BIA or our circuit. That the BIA adopted the IJ's decision does not strengthen the BIA's basis for rejecting Ramos's argument. The IJ merely noted that he was unaware of any precedent that had directly allowed such imputation, but did not address the cases Ramos cited to support his argument. Therefore, we review de novo the remaining question presented by Ramos's petition: Should a minor who applies for NACARA relief as a derivative of his parent be permitted to impute his parent's physical presence for purposes of satisfying the seven-year requirement?

(ii)   Analogous Precedent

[13] While we have not previously addressed whether a parent's physical presence can be imputed to his minor child for purposes of NACARA relief, we have interpreted analogous immigration statutes.

In *Lepe-Guitron v. INS*, 16 F.3d 1021, 1022 (9th Cir. 1994), we addressed the concept of "imputation" in the context of a discretionary waiver of deportation under the now-repealed Immigration and Nationality Act ("INA") section 212(c),[14] 8 U.S.C. § 1182(c), which required, inter alia, seven years of "lawful unrelinquished domicile." We held that a parent's "lawful unrelinquished domicile" can be imputed to his minor child. *Lepe-Guitron*, 16 F.3d at 1022. The petitioner, a minor, had "legally entered the United States with his parents, was always legally within the country, was domiciled here, but acquired permanent resident status . . . many years after his parents achieved it" because of a processing error attributable to the INS. *Id.* at 1024. We first observed that section 212(c) "was enacted to alleviate the harsh effects of deportation on those aliens who have lawfully established substantial ties to the United States." *Id.* at 1023. We then reasoned that, "[b]ecause children naturally form the strongest of ties to the place where their parents are domiciled and they with them, section 212(c)'s core policy concerns would be directly frustrated by the government's proposal to ignore the parent's domicile in determining that of the child." *Id.* at 1025.

We found further support for our analysis in Congress's use of the term "domicile." *Id.* Adopting the common law definition of "domicile"—that "aliens must not only be physically present [in the United States], but must intend to remain"—we reached the "unremarkable" conclusion that "a child's domicile follows that of his or her parents." *Id.* (internal quotation marks omitted).We explained that "because children are, legally speaking, incapable of forming the necessary intent to remain indefinitely in a particular place," they cannot determine their own domicile. *Id.* Finally, we noted that other sections of the INA giving "a high priority to the relation between permanent resident parents and their children" strengthened our analysis. *Id.*

---

[14]Section 212(c) was repealed by IIRIRA, § 304(b), 110 Stat. at 3009-597. *See INS v. St. Cyr*, 533 U.S. 289, 297 (2001).

Two years after we decided *Lepe-Guitron*, Congress replaced section 212(c) with INA section 240A(a), 8 U.S.C. § 1229b(a), which governs cancellation of removal for lawful permanent residents.[15] *See St. Cyr*, 533 U.S. at 297. Because section 240A(a) modified section 212(c) in several key respects, our holding in *Lepe-Guitron* came into question. In *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013 (9th Cir. 2005), we reaffirmed *Lepe-Guitron*'s viability and extended its holding to § 1229b(a)'s requirement of seven years of continuous residence in the United States.

Cuevas-Gaspar had lived in the United States since he was one year old, but he did not attain lawful permanent residence until he was approximately thirteen. *Id.* at 1016. He sought cancellation of removal less than seven years later. *Id.* Both the IJ and the BIA concluded that he was ineligible for cancellation of removal because he failed to satisfy § 1229b(a)'s requirement of seven years of continuous residence after admission. *Id.* at 1016-17; *see* 8 U.S.C. § 1229b(a)(2).

Applying the two-step *Chevron* inquiry and determining that deference to the BIA was not warranted, *Cuevas-Gaspar*, 430 F.3d at 1026, we held that "for purposes of satisfying the seven-years of continuous residence 'after having been admitted in any status' required for cancellation of removal under 8 U.S.C. § 1229b(a), a parent's admission for permanent resident status is imputed to the parent's unemancipated minor

---

[15]Title 8 U.S.C. § 1229b(a) provides:

> The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
>
> (1)   has been an alien lawfully admitted for permanent residence for not less than 5 years,
>
> (2)   has resided in the United States continuously for 7 years after having been admitted in any status, and
>
> (3)   has not been convicted of any aggravated felony.

children residing with the parent," *id.* at 1029. Instructed by *Lepe-Guitron*, we reasoned that the difference between "lawful unrelinquished domicile" and residence "after having been admitted in any status" was not "so great as to be dispositive" and "[did] not justify a departure from the INA's policy of putting a high priority on relations between permanent legal residents and their children." *Id.* at 1026.

We also cited specific examples to demonstrate that "both the BIA and this court repeatedly have held that a parent's status, intent, or state of mind is imputed to the parent's unemancipated minor child in many areas of immigration law, including asylum, grounds of inadmissibility, and legal residency status." *Id.* at 1024. We first discussed *Vang v. INS*, 146 F.3d 1114 (9th Cir. 1998), in which we applied the principles articulated in *Lepe-Guitron* to the question of whether "aminor has firmly resettled in another country." *Id.* at 1116. We noted in *Vang* that, under INS regulations, the child of a refugee or asylee is generally entitled to the same legal status as her parent. *Id.* Because "it would be unreasonable to hold an adolescent responsible for arranging or failing to arrange permanent resettlement," *id.* (internal quotation marks omitted), we concluded that we must "look to whether the minor's parents have firmly resettled in a foreign country before coming to the United States, and then derivatively attribute the parents' status to the minor," *id.* at 1116-17.

Next, we addressed *Senica v. INS*, 16 F.3d 1013 (9th Cir. 1994), in which we agreed with the BIA that a parent's knowledge of ineligibility for admission to the United States should be imputed to her children. *Id.* at 1015-16. We concluded in *Senica* that "[t]he BIA's decision here was not a departure from its previous practice of imputing a parent's state of mind, or failure to reasonably investigate, to an unemancipated minor child." *Id.* at 1016. Finally, we observed in *Cuevas-Gaspar* "that the BIA has commonly imputed a parent's abandonment of permanent legal resident status to the parent's minor children." 430 F.3d at 1025 (citing, for exam-

ple, *Matter of Zamora*, 17 I. & N. Dec. 395, 396 (BIA 1980) (holding that the voluntary and intended abandonment of lawful permanent resident status by the parent of an unemancipated minor child is imputed to the child); *Matter of Winkens*, 15 I. & N. Dec. 451, 452 (BIA 1975) (holding that parents' abandonment of lawful permanent resident status was imputed to their minor child "who was subject to their custody and control")).

We then turned to Congress's intent in enacting § 1229b. *Cuevas-Gaspar*, 430 F.3d at 1026-27. Relying on the relevant legislative history, we determined that Congress had replaced section 212(c) with section 240A(a) to resolve the conflicting interpretations of "unrelinquished lawful domicile," not to narrow the continuous residency rule. *Id.* at 1028.

We left open the question of whether a parent's permanent resident status may be imputed to his child for purposes of § 1229b(a)'s five-year residency requirement. *Id.* at 1021 n.5; *see* 8 U.S.C. § 1229b(a)(1) (requiring a showing that an alien has been "lawfully admitted for permanent residence for not less than 5 years"). We recently answered this question in *Mercado-Zazueta v. Holder*, No. 07-71428 (9th Cir. 2009). Relying on our reasoning in *Lepe-Guitron* and *Cuevas-Gaspar*, we held that, "for purposes of satisfying the five years of lawful permanent residence required under . . . § 1229b(a)(1), a parent's status as a lawful permanent resident is imputed to the unemancipated minor children residing with that parent." *Id.* at 12617.

### (iii) Application to NACARA

We reject Ramos's argument that we should extend our reasoning in *Lepe-Guitron* and *Cuevas-Gaspar*[16] to impute a parent's physical presence in the United States to his minor

---

[16]*Mercado-Zazueta* had not yet been published when the parties filed their briefs.

child for purposes of satisfying NACARA's seven-year physical presence requirement. The meaning of "physical presence" is quite distinct from the requirements we have previously held to be imputable. Indeed, the difference in meaning is "so great as to be dispositive," *Cuevas-Gaspar*, 430 F.3d at 1026. Moreover, neither NACARA's legislative history nor its underlying policy compels a different conclusion.

**[14]** Our precedent demonstrates that we impute a parent's status, intent, or state of mind to satisfy immigration criteria that an unemancipated minor child must meet. The requirements at issue in *Lepe-Guitron* ("lawful unrelinquished domicile"), *Cuevas-Gaspar* ("admitted in any status"), *Mercado-Zazueta* ("lawfully admitted for permanent residence"), *Vang* ("firmly resettled"), *Senica* (knowledge of ineligibility), and *Matter of Zamora* (abandonment of lawful permanent resident status) are all terms of art that include an element of status, intent, or state of mind. We have allowed imputation precisely because the minor either was legally incapable of satisfying one of these criteria or could not reasonably be expected to satisfy it independent of his parents. In *Lepe-Guitron*, for example, we used "a definition of domicile consonant with its common law meaning: that aliens must not only be physically present here, but must intend to remain." 16 F.3d at 1025 (internal quotation marks omitted). We explained that "a child's domicile follows that of his or her parents" because "children are, legally speaking, incapable of forming the necessary intent to remain indefinitely in a particular place." *Id.* Accordingly, we imputed to the petitioner his parents' years of "lawful unrelinquished domicile" in the United States.

In *Cuevas-Gaspar*, our decision to impute turned on the meaning of "admitted," which is defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Although the petitioner had lived in the United States with his lawfully admitted mother since he was one, he was not "ad-

mitted" until he was thirteen. *Cuevas-Gaspar*, 430 F.3d at 1016. Analogizing to our precedent and that of the BIA, we suggested that it would be unreasonable to hold a minor, who was subject to his mother's custody and control, responsible for failing to satisfy this administrative procedure. *Id.* at 1024 -25. Because policy considerations and the legislative history of § 1229b added support to our statutory analysis, *see id.* at 1026-29, we imputed to the petitioner his mother's "admitted" status for purposes of satisfying the seven years of continuous residence after having been "admitted in any status" required for cancellation of removal, *id.* at 1029.

*Mercado-Zazueta* followed directly from *Lepe-Guitron* and *Cuevas-Gaspar*. Addressing § 1229b(a)'s requirement that an alien have been "lawfully admitted for permanent residence" —defined as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed"[17] —for not less than five years, we reasoned that the difference between "lawful unrelinquished domicile" and "lawfully admitted for permanent residence" was no greater than the difference between "lawful unrelinquished domicile" and and "lawfully admitted," *Mercado-Zazueta*, No. 07-71428, at 12609-10. We thus concluded that the BIA's interpretation of § 1229b(a) was unreasonable and that "*Cuevas-Gaspar* compels the conclusion[ ] that imputation . . . is appropriate." *Id.* at 12614; *see also Vang*, 146 F.3d at 1116-17 (discussing whether the petitioner had "firmly resettled," as defined in 8 C.F.R. § 1208.15).

**[15]** By contrast, the definition of "physical presence" does not require a specific "status, intent, or state of mind." *Cuevas-Gaspar*, 430 F.3d at 1024. Because "physically present" is not defined in section 203, in 8 U.S.C. § 1101, or in any of the relevant regulations, *see* 8 C.F.R. §§ 1240.60, .61, .66, "we give it its ordinary meaning." *United States v. San-*

---

[17]8 U.S.C. § 1101(a)(20).

*tos*, 128 S. Ct. 2020, 2024 (2008). The relevant dictionary definition of "physically"/"present" is "corporeally"/"being in the place in question or under consideration." Oxford English Dictionary XI:746, XII:395 (2d ed. 1989). Our case law generally relies on this meaning of "physically present." For example, in *Kalaw v. INS*, 133 F.3d 1147 (9th Cir. 1997), where we examined the transitional rules of IIRIRA, we explained that "[t]he first eligibility requirement, continuous physical presence, must be determined from the facts, not through an exercise of discretion. Either the petitioner has been continuously present in the United States for seven years or the petitioner has not." *Id.* at 1151. In other words, the definition of "physical presence" is a state of being, not a state of mind; it is not conferred by an immigration officer or a governmental agency; it depends on no legal construct.[18] Therefore, it can be attained as readily by a minor as by his parent.

[16] The distinction between physical presence, on the one hand, and status, intent, state of mind, and analogous concepts, on the other, is readily observed here. Unlike the petitioners in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Mercado-Zazueta*, Ramos had not lived in the United States for almost his entire life when he applied for relief; he had only just arrived. Ramos necessarily would have satisfied the physical presence requirement had he been in the custody of his father (who *was* physically present in the United States for more than a decade before Ramos arrived). In other words, unlike the petitioners in our prior decisions, Ramos had no additional

---

[18]As a practical matter, most persons intend to be physically present in the particular place in which they are located, but this is not always the case. Strictly speaking, intent is irrelevant to physical presence. More specifically, *why* someone is physically present in the United States is irrelevant for purposes of the statutory requirement at issue here; all that matters is that the person is physically present. It is therefore logical that, unlike in the requirements we examined in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Mercado-Zazueta*, "physical presence" does not incorporate intent as an element.

legal or administrative hurdles to clear beyond mere presence.[19] Ramos was either corporeally within the borders of the United States or he was not. Because he was not, he cannot meet the physical presence requirement, and there is no legal basis for imputing his father's physical presence.

Nor does NACARA's legislative history support Ramos's argument that Congress intended to allow minors to impute their parents' physical presence for purposes of relief under the Act. The legislative history does not mention imputation, which Ramos does not dispute. Rather, he argues that, because "[t]he law was passed to assist individuals to gain legal status in the United States," allowing imputation would be consistent with the "spirit of NACARA." While we agree that Congress's primary goal in enacting NACARA was to decrease obstacles to asylum relief for qualified individuals,[20]

_____

[19]We leave open the question of whether a child under the age of seven who was present in the United States when his parent filed an asylum application could be granted NACARA relief. *See* Dep't of Justice, INS, Rules and Regulations, Suspension of Deportation and Special Rule Cancellation of Removal for Certain Nationals of Guatemala, El Salvador, and Former Soviet Bloc Countries, 64 Fed. Reg. 27856-01, 27861 (May 21, 1999) [hereinafter Rules and Regulations], *available at* 1999 WL 316287 (noting that if a child is present in the United States at the time his parent's asylum application is filed, she is "considered to have filed an application for asylum on the date the principal's asylum application was filed").

[20]We previously have recognized that "Congress enacted section 203 of NACARA in reaction to IIRIRA's severe consequences in making thousands of immigrants, including those from Guatemala, ineligible for suspension of deportation." *Albillo-De Leon*, 410 F.3d at 1096. Moreover, the legislative history suggests that a flexible approach should be used in interpreting and applying NACARA. *See, e.g.*, 143 Cong. Rec. at S12266 ("[G]iven the special solicitude Congress is showing toward the Eligible Class Members by enacting [NACARA] . . . it would . . . be entirely consistent with that intent for the Attorney General . . . not to challenge applications for relief by Eligible Class Members on hardship grounds if the applicant satisfies the seven-year presence and good moral character requirements."); *see also* White House, Office of Commc'ns, Statement on DC Appropriations Act 11/19/97 (Nov. 24, 1997) (statement of President Clinton), *available at* 1997 WL 727883 ("I . . . am asking the Attorney General to consider the ameliorative purposes of [NACARA] and the unique history and circumstances of the people covered by it in giving effect to its provisions.").

we disagree that this goal justifies imputing a parent's physical presence under section 203. An individual must first be deemed "qualified" before he can reap the benefits of NACARA relief.

Statements made by the INS around the time NACARA went into effect also undercut Ramos's argument:

> [S]ection 203 of NACARA . . . allow[s] children and spouses to apply for relief under NACARA, even if they had not been continuously physically present in the United States for 7 years at the time NACARA was enacted or implemented. To meet the physical presence requirement, *the spouse or child must have 7 years of continuous physical presence in the United States . . . as of the date the application for relief was filed.*

Rules and Regulations, at 27861 (emphasis added). Although the INS was not directly addressing the question before us, its statements necessarily assume that the spouse or child must independently satisfy the seven-year requirement. Particularly in light of Congress's silence on imputation in the legislative history, these statements support the conclusion we reach through our statutory interpretation—that Congress did not intend to allow imputation in this context.

Ramos also makes three policy arguments for allowing imputation of his father's physical presence: (1) that "our immigration statutes and regulations are replete with provisions 'giving a high priority to the relation between permanent resident parents and their children,' " *Cuevas-Gaspar*, 430 F.3d at 1024 (quoting *Lepe-Guitron*, 16 F.3d at 1025); (2) that he would suffer a "peculiar or unusual hardship" if we refuse to impute his father's physical presence to him, *Lepe-Guitron*, 16 F.3d at 1024 (internal quotation marks omitted); and (3) that we adhere to "the general canon of construction that resolves ambiguities in favor of the alien," *Cuevas-*

*Gaspar*, 430 F.3d at 1029; *see also Hernandez v. Ashcroft*, 345 F.3d 824, 840 (9th Cir. 2003).

None of these general considerations persuades us that imputation is appropriate here. Although we have allowed imputation for purposes of satisfying a number of requirements in immigration statutes, we have not done so when neither the statutory language nor the legislative history supported that result. Moreover, as already discussed, the key fact supporting the policy rationales articulated in *Lepe-Guitron*, *Cuevas-Gaspar*, and *Mercado-Zazueta*—that the minor resided with his or her family in the United States—is absent here. Not only has Ramos lived in Guatemala nearly all his life, but most of his family still lives there. Thus, he has not "formed strong ties to the United States." *Lepe-Guitron*, 16 F.3d at 1025. Because disallowing imputation in this context does not sever the "bonds between parents and their children who had resided legally in the United States for the better part of their lives," *id.*, it does not frustrate the "just and humane goal of providing relief to those for whom deportation would result in peculiar or unusual hardship," *id.* at 1024 (internal quotation marks omitted). Finally, while the text of NACARA does not explicitly prohibit imputation, neither is it ambiguous, as our statutory analysis makes clear. Therefore, we need not read it in the light most favorable to Ramos.

**[17]** For the foregoing reasons, we conclude that Ramos is ineligible for asylum, withholding of removal, CAT relief, or special rule cancellation of removal. Accordingly, we deny his petition for review.

**PETITION DENIED.**